1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10
                              ----oo0oo----
11

12   CENTURY 21 REAL ESTATE LLC, a
     Delaware Limited Liability
13   Company formerly known as
     Century 21 Real Estate        NOS. CIV.  2:10-2751 WBS GGH
14   Corporation,                             2:10-2846 WBS GGH
                                              2:11-2497 WBS GGH
15                                            CONSOLIDATED
                 Plaintiff,
16                                  MEMORANDUM & ORDER RE: CENTURY
          v.                        21'S MOTION FOR SUMMARY
17                                  ADJUDICATION
     ALL PROFESSIONAL REALTY, INC.,
18   a California corporation doing
     business as CENTURY 21 ALL
19   PROFESSIONAL; STEVEN M.
     WRIGHT, an individual; and
20   CAROL WRIGHT, an individual,

21                 Defendants.
     _____/
22
                              ----oo0oo----
23

24        Century 21 Real Estate LLC ("Century 21") filed an

25   action against All Professional Realty, Inc. ("All

26   Professional"), Steven M. Wright, and Carol Wright arising from

27   All Professional's continued use of Century 21's trademarks

28   following the terminations of real estate brokerage franchise

                                  1

1   agreements for unpaid fees.  (No. 2:10-2751.)  Steve Wright,[1]

2   Carol Wright, and All Professional filed a related action against

3   Century 21 arising from the franchise agreements.  (No.

4   2:10-2846.)  Century 21 filed a third action against All

5   Professional Hawaii Realty Inc. ("All Professional Hawaii"), John

6   Sherman, Steve Wright, and Carol Wright arising from All

7   Professional Hawaii's allegedly wrongful use of Century 21's

8   trademarks following the termination of another real estate

9   brokerage franchise agreement.  (No. 2:11-2497.)  All three of

10  these cases have been consolidated.  Presently before the court

11  is Century 21's motion for summary adjudication pursuant to

12  Federal Rule of Civil Procedure 56.

13  I.   Factual and Procedural Background

14         In 1994, Steve and Carol Wright formed All

15  Professional, a real estate brokerage company.  (Compendium of

16  Exhibits Ex. 42 ("Steve Wright Dep. I") at 12:13-22 (Docket No.

17  106)[2]; Steve Wright Decl. in Opp'n to Century 21's Mot. for

18  Prelim. Injunction ("Steve Wright Decl.") ¶ 2 (Docket No. 18-2).)

19  All Professional signed its first franchise agreement with

20  Century 21 in 1995, which allowed it to operate an office under

21  the name "Century 21 All Professional."  (Steve Wright Dep. I at

22  20:3-23; Steve Wright Decl. ¶ 3.)  Century 21 is a franchisor of

23  real estate brokerages.  (Bertet Decl. ¶ 3 (Docket No. 88-4).)

24  _____

25       [1]    The parties use "Steve Wright" and "Steven M. Wright."
    Because he is captioned as Steve Wright in the action initiated
26  by him, the court will use Steve Wright.

27       [2]    Except where otherwise noted, all citations to the
    docket refer to case number 10-2751, into which all three cases
28  were consolidated.

A.   Franchise Agreements

All Professional[3] operates multiple offices and each office is governed by a separate franchise agreement with Century 21.   In November of 2005, All Professional signed three ten-year franchise agreements with Century 21 for two offices in Sacramento[4] and one office in Folsom, California, with an effective date of December 1, 2005, for each franchise agreement. (Bertet Decl. Exs. A-C §§ 1.5, 1.7.)   The Wrights also signed a personal guaranty of All Professional's obligations under the three California franchise agreements.   (Id. Exs. A-C at 43-44.)

Shortly after signing the franchise agreements for the California franchises, the Wrights and their business partner John Sherman, on behalf of All Professional Hawaii, signed a ten-year franchise agreement with Century 21 for the operation of an office in Honolulu, Hawaii.   (Id. ¶ 6, Ex. D.)   The Wrights, together with Sherman, again signed a personal guaranty for All Professional Hawaii's obligations under the Hawaii franchise agreement.   (Id. Ex. D at 43-44.)

All four franchise agreements include the same relevant language.   Section 4.1 of the franchise agreements granted All Professional a nonexclusive license to use Century 21's "Marks" and "System."   (Id. Exs. A-D § 4.1.)   "Marks" meant Century 21's trademarks, service marks, and trade dress.   (Id. Exs. A-D

---

[3]      The court will refer to All Professional, All Professional Hawaii, Steve Wright, and Carol Wright collectively as "All Professional."

[4]      When referring to the Sacramento franchise agreements individually, the court will reference the franchise by the street on which it is located -- River Park and Florin Road.

1  § 3.1.8.)  "System" meant, <u>inter alia</u>, "policies, procedures, and

2  techniques designed to enable [] offices to compete more

3  effectively in the real estate sales market."  (<u>Id.</u> Exs. A-D

4  § 3.1.14.)  Century 21's "system" also included "common use and

5  promotion of certain Marks, copyrights, trade secrets,

6  centralized advertising programs, recruiting programs, referral

7  programs and sales management training programs." (<u>Id.</u>)

8       Century 21 has numerous registered trademarks.  (<u>See</u>

9  Iuliano Decl. ¶ 3, Ex. A (Docket No. 88-3).)  According to

10  Century 21, it uses the trademarks on goods and in

11  advertisements, education, training manuals, newsletters, global

12  computer networks, and residential, commercial, and mortgage

13  brokerage services.  (Id. ¶ 5.)  The trademarks have become well

14  recognized because of advertisements and promotions of goods and

15  services offered by Century 21.  (Id.)

16       In exchange for the rights granted under the franchise

17  agreements, All Professional agreed to pay royalty fees of six

18  percent of gross revenue, with an initial monthly minimum fee of

19  $500.00.  (Bertet Decl. Exs. A-D §§ 7-8.)  All Professional also

20  agreed to pay two percent of its gross revenue to a National

21  Advertising Fund ("NAF") for advertising expenses, with an

22  initial monthly minimum fee of $562.00.

23       Section 16.2.3 of the franchise agreements provided

24  that Century 21 could terminate the agreement for good cause,

25  including curable and non-curable defaults by All Professional.

26  (Id. Exs. A-D § 16.2.3.)  Section 16.2.4, governing termination

27  for curable defaults, provided that Century 21 could terminate

28  the agreement with 30 days notice of the "proposed termination

4

and the opportunity to cure the breach during the entire notice period, or such longer or shorter notice as is required or permitted by the law of the state where the Office is located," if the curable breach was the failure to pay financial obligations. (<u>Id.</u> Exs. A-D § 16.2.4.)  Section 16.2.5 provided that Century 21 could terminate the agreement without notice if termination was based on any non-curable defects. (<u>Id.</u> Exs. A-D § 16.2.5.)  Non-curable defects included abandonment of an office demonstrated by, among other things, a franchisee's failure to operate at an approved location for five consecutive business days. (<u>Id.</u> Exs. A-D § 16.2.5.4.)

The agreements also contained language stating that they were integrated agreements and that the franchisee should not sign the agreement if any representative of Century 21 promised something that was not part of the agreement, an attached addendum, or the offering circular. (<u>Id.</u> Exs. A-D § 22.15.)  The agreements further stated that the success of the franchise was dependant on the efforts of the franchise owners and that neither Century 21 nor any other person "guaranteed or warranted that you will succeed in the operation of the Franchise, or has provided any sales or income projections of any kind to you." (<u>Id.</u> Exs. A-D § 23.9.)  Finally, the agreements provided that Century 21 would "have no right to regulate or participate in the recruitment, selection, engagement, retention, discipline or termination of your sales associates or employees, except as may be necessary to protect the Marks and goodwill" and that defendants were "solely responsible for the conduct of the Business operated under this Agreement according to [their] own

judgment, and in accordance with the provisions of this Agreement and the P&P Manual . . . ." (<u>Id.</u> Exs. A-D § 21.2.)

B. <u>Development Advance Promissory Note</u>

In addition to entering into the California franchise agreements in November of 2005, All Professional borrowed $75,000.00 from Century 21 pursuant to a Development Advance Promissory Note ("DAN" or "Note") for which the Wrights signed a personal guaranty. (Bertet Decl. Ex. D.)  The Note provided for a long-term, annual repayment plan and provided that if All Professional was not in breach of its franchise agreements, the yearly amount due would be forgiven if All Professional reached certain gross revenue annual thresholds. (Id.)  If the revenue thresholds were not met, the Note stated that "an amount of Principal equal to the Yearly Principal shall become due and payable." (Id.)  In the event that All Professional terminated its business or defaulted on "any other agreement or note" between the parties, the DAN provided for an acceleration of the unpaid principal. (Id.)  In addition to the Note, All Professional and the Wrights signed a Security Agreement in which they granted Century 21, as security for the prompt payment of the Note, a security interest in certain specifically described collateral. (Id. ¶ 20, Ex. F.)

The Wrights state that they executed the Note relying on statements by Dale Omer, Century 21's Western Regional Vice President, that "everything would be wonderful." (Steve Wright Dep. I at 62:1-6.)  According to the Wrights, Omer told them "not to worry" about repaying the DAN because the new "tools and systems" that Century 21 would provide would "revolutionize

[Century 21] offices compared to the competition" and make All Professional more profitable.  (Id. at 59:19-60:2; 62:13-15.) Despite these representations, Steve Wright concedes that he does not "believe they ever said that we would be profitable.  They said we would be more productive and sell more houses."  (Id. at 67:11-15.)

C.   Addenda to Franchise Agreements and Waiver of Claims

All Professional signed an addendum to the River Park franchise agreement, effective January 3, 2006, which amended the franchise agreement to include section 25.4 pertaining to the DAN.  (Bertet Decl. ¶ 22, Ex. G § 25.4.)  The addendum provided that "in the event of any termination of this agreement for any reason prior to the expiration of the Term . . . any and all sums due and owing (and/or not otherwise previously forgiven) under the Development Advance Note may be accelerated (at Franchisor's discretion) and shall be immediately payable."  (Id.)

All Professional also signed addenda to the other two California franchise agreements that did not relate to the DAN. All three addenda contained a limited waiver of claims from which All Professional and the Wrights agreed to expressly release Century 21 from, and forever waive and relinquish, any and all claims they might have against Century 21, as well as a waiver of All Professional and the Wrights' rights under section 1542 of the California Civil Code.  (Id. ¶ 22, Ex. G at 115.)  All Professional and the Wrights also signed an addendum to the Hawaii franchise, effective February 1, 2006, which contains a similar waiver of claims.  (Id. ¶ 24, Ex. H at § 5.)

D.   Improper Recruiting Practices

7

Beginning in late 2006, All Professional argues that Century 21 All Islands, another Century 21 franchise office located in Hawaii, was engaged in an aggressive campaign to recruit All Professional Hawaii's agents in violation of Century 21's "Code of Conduct."[5]  Steve Wright informed Sandy Persky, Century 21's Regional Director assigned to Hawaii, about All Islands' recruiting violations in an email dated December 19, 2006. (Compendium of Exhibits Ex. 16 at CENT002539 (Docket No. 104).)[6]  On July 20, 2007, Steve Wright sent a second email to Persky, Omer, and Bob Popp at Century 21 complaining about All Islands' recruiting practices.[7]  (Id. Ex. 16 at CENT002538.) This second email specified that All Professional did not expect Century 21 to take any actions based on the complaint.  (Id.) The email chain following Steve Wright's second complaint suggests that as of July 25, 2007, Century 21 had not done

---

[5]     Century 21's Policies and Procedures Manual stated that franchisees "should avoid" recruiting sales associates of other franchisees and "advised that aggressive sales associates recruiting practices may subject the broker involved to claims of business interference by other brokers under applicable state law."  (Steve Wright Decl. Ex. 2.)

[6]     The court notes that although All Professional did inform Century 21 about the alleged recruiting violations, the email also stated that All Professional was "OK with [the recruiting violation] being 'OK'," that it did not expect the practice to stop given All Islands' past recruiting practices, and that All Professional would be "actively recruiting All Island agents" in retaliation.  (Compendium of Exhibits Ex. 16 at CENT002539.)

[7]     Although this email contained complaints regarding All Islands practices, it also specifically stated that All Professional would "remove any restrictions Century 21 All Professional has against All Island's [sic] recruiting [its] agents" and had "added All Island agents into our recruiting pool."  (Compendium of Exhibits Ex. 16 at CENT002538.)

anything regarding All Islands' alleged recruiting violations.
(Id.)

On April 18, 2008, Steve Wright sent Persky an
additional email with attachments documenting All Islands'
recruitment efforts. (Id. Ex. 17.) Persky forwarded the email
to Popp. (Id.) Popp contacted the All Islands broker and
suggested that he stop recruiting All Professional Hawaii's
agents. (Compendium of Exhibits Ex. 46 ("Popp Dep. I") at 59:9-
60:18 (Docket No. 108).) On May 7, 2008, Steve Wright notified
Persky and Popp that he was resigning from the Hawaii Broker
Counsel because of All Islands' recruitment practices.
(Compendium of Exhibits Ex. 18 (Docket No. 104).)

Beginning in 2008, a number of All Professional's
agents from its California franchises left to work at Century 21
Select. (Steve Wright Dep. I at 142:21-143:14.) Based on
conversations with the agents, Steve Wright believed that Select
was improperly recruiting his agents, in part by offering them
commissions that would result in a net loss to Select. (Id. at
146:11-147:18; see also Compendium of Exhibits Ex. 40 (agent
compensation information from Century 21 Select).) Steve Wright
also claims that at least two of All Professional's former agents
stole commission checks from All Professional and cashed them
after they transferred to Select. (Steve Wright Dep. I at 155:5-
16, 157:5-22.) Steve Wright informed Century 21 that other
franchisees were "openly competing with All Professional and
stealing its business and employees" in violation of Century 21's
"Code of Conduct." (Steve Wright Decl. ¶ 9.) Popp acknowledges
receipt of an email from All Professional complaining about

stolen commissions, but did not take any action regarding the
complaint.  (Popp Dep. I at 72:16-73:3.)

On August 4, 2008, Steve Wright informed Century 21
that he would no longer participate in Broker Council activities
for the Sacramento area due to Century 21's "policy of allowing
Select, All Islands, Homefinders to recruit our agents/staff
. . . ."  (Compendium of Exhibits Ex. 19 (Docket No. 104).)

E.   Protection of Century 21 Trademark

All Professional also argues that Century 21 allowed
other businesses to dilute the Century 21 trademark in All
Professional's area when two real estate offices not affiliated
with Century 21, moved into the Folsom area operating as "21st
Century Realty" and "First Century."  (Steve Wright Dep. I at
116:6-117:16, 234:14-235:23.)  Steve Wright states that he
petitioned Popp to have Corporate take action against the
trademark infringement in 2004 or 2005.[8]  (Id. at 235:13-25.)
Steve Wright reports that Popp responded that "there was nothing
he was going to be able to do, that we just had to deal with it."
(Id. 116:17-23.)

All Professional argues that Century 21 took no
substantive action on the trademark issue until after All
Professional moved out of the Folsom office and Century 21 Select

_____

[8]    Popp states that he was not working for Century 21 in
2004 or 2005, but actually began his position as Vice President
with Century 21 in 2006.  (Rudin Decl. Ex. F. ("Popp Dep. II") at
9:4-25, 17:14-16 (Docket No. 88-10).)  Popp does not recall
meeting the Wrights until 2007.  (Id. at 23:19-23.)  In Steve
Wright's second deposition, held six months after the first, he
clarifies that he probably first spoke with Popp regarding the
trademark issue in 2006.  (Compendium of Exhibits Ex. 43 ("Steve
Wright Dep. II") at 33:20-22 (Docket No. 107).)

1    moved into the office.  (Steve Wright Dep. I at 235:2-12.)  After

2    All Professional's franchise was terminated on October 8, 2010,

3    Century 21's legal counsel sent Henry Ung from 21st Century

4    Network, one of the non-affiliated offices, written notification

5    that 21st Century Network was in violation of Century 21's

6    trademark and demanded that it cease using the marks or face

7    further legal action.  (Compendium of Exhibits Ex. 39 (Docket No.

8    105).)

9          F.   Folsom Office

10              In late August 2009, All Professional ceased doing

11   business out of its Folsom office. (Steve Wright Dep. I at 201:6-

12   11.)  The office closure occurred after the building was

13   foreclosed upon, either due to a partnership break-up between All

14   Professional and a separate entity, (Steve Wright Dep. II at

15   27:14-29:5), or because All Professional was struggling

16   financially after agents left and its income dropped, (Steve

17   Wright Dep. I at 201:12-21).  All Professional did not seek

18   approval from Century 21 prior to closing the Folsom office.

19   (Id. at 201:22-202:2.)

20              On October 27, 2009, Century 21 inquired as to the

21   status of All Professional's Folsom office.  (Compendium of

22   Exhibits Ex. 24 (Docket No. 104).)  All Professional responded

23   that it was relocating the Folsom office and "expect to be fully

24   operational the first of the year."  (Id.)  All Professional also

25   stated that it would advise Century 21 when the new address was

26   finalized.  (Id.)

27              In February 2010, Mike Bainbridge, a Century 21

28   business consultant, suggested that All Professional merge its

                                      11

Folsom office with its Sacramento office in order to avoid paying minimum monthly fees on the Folsom office that was not currently operating.  (Compendium of Exhibits Ex. 48 ("Bainbridge Dep.") at 106:16-107:8 (Docket No. 110); Steve Wright Dep. I at 203:19-204:13.)  All Professional did not elect to consolidate the offices.

On February 5, 2010, Dan Jacuzzi, the owner of Century 21 Select, emailed Marc Fischman at Century 21 about opening up a Century 21 Folsom office at the same location that All Professional had abandoned.  (Compendium of Exhibits Ex. 25 at CENT004385 (Docket No. 104).)  Before opening up a Folsom location, however, Jacuzzi wanted to "insure [sic] that the prior (now closed) franchise of All Professional be terminated."  (Id.)  On February 11, 2010, Bainbridge sent Jacuzzi an application for the new Folsom office and stated that he was "working on the other half of the request and will keep you posted as to how that progresses."  (Id. at CENT004275.)

On May 24, 2010, Century 21 sent All Professional notice that it had terminated All Professional's Folsom office on the grounds of abandonment.  (Compendium of Exhibits Ex. 31 (Docket No. 105).)  On May 26, 2010, Century 21 approved Jacuzzi's application to open an office in Folsom using the building that All Professional had vacated.  (Compendium of Exhibits Ex. 47 ("Popp Dep. III") at 13:24-14:15, 22:5-10 (Docket No. 109).)  All Professional argues that Century 21's termination of its Folsom office was the result of Century 21 favoring Select over All Professional.

G.   Failure to Pay Century 21 Franchise Fees

12

1    Beginning in May of 2009, All Professional stopped
2  paying many of its franchise fees.  (Bertet Decl. ¶ 25.)  All
3  Professional was aware that it had failed to pay the fees.
4  Century 21's online system provides its franchisees with
5  "detailed summaries of their account balances owed to Century 21,
6  including specific information detailing the amounts owed by that
7  franchisee, when the amounts are due, and the type of amount due
8  (i.e., royalty fee, national advertising fee fund fee,
9  Development Advance Note, etc.)[.]"  (Id. ¶ 30.)

10    During and prior to this period, All Professional also
11  failed to meet its annual thresholds requirement and thus annual
12  DAN payments for 2007, 2008, and 2009 were not forgiven.  When
13  Century 21 approached All Professional regarding payment of the
14  DAN fees, Century 21 offered to waive the payment in exchange for
15  a one-year extension of each franchise agreement and a general
16  release of claims.  (Compendium of Exhibits Ex. 23 (Docket No.
17  104).)  All Professional rejected Century 21's proposal and
18  instead offered a counterproposal of a 15-day extension of the
19  franchise agreement.  (Id.)  Steve Wright later also proposed
20  that Century 21 have "Select fire the 8 agents he [Jacuzzi] has
21  bought and Homefinders fire the 5 agents they have allowed John
22  Sherman to recruit."  (Id.)  Century 21 rejected the
23  counteroffers.  (Id.)  Thereafter, All Professional failed to
24  make any payments on the Note.

25    H.   Termination of Franchises

26    In four separate letters dated April 5, 2010, Century
27  21 notified All Professional of its intent to terminate the four
28  franchise agreements and of All Professional's opportunity to

13

1  cure.  (Bertet Decl. Exs. I-L.)  The notice pertaining to the

2  River Park Drive office stated in pertinent part:

> Century 21 has advised you on numerous occasions that you
> are delinquent in the payment of your account.  Upon
> review, we have determined that you are in default of the
> above-referenced Agreement for failing to pay fees when
> due.  Your default constitutes a material breach of the
> Agreement, for which Century 21 may terminate the
> franchise.
>
> As of February 24, 2010, your account balance for this
> office was $59,327.41.
>
> In order to avoid termination, you must pay the balance
> in full no later than May 10, 2010.

10  (Id. Ex. I.)  The notice also provided contact information for

11  Jacqueline Bertet, Century 21's Senior Director of Financial

12  Services, and informed All Professional that failure to pay the

13  balance would result in immediate termination of the franchise,

14  which would require All Professional to pay the amount past due

15  at the time of termination, sums assessed in a post-termination

16  audit, the remaining balance of the Note, and lost profits.

17  (Id.)  The notice pertaining to the Florin Road, Sacramento,

18  office contained similar language and stated that the balance was

19  $23,492.69 as of February 24, 2010.  (Id. Ex. K.)  The notice

20  pertaining to the Folsom office contained similar language and

21  stated that the balance was $13,274.34 as of February 24, 2010.

22  (Id. Ex. J.)  The notice pertaining to the Honolulu office

23  contained similar language and stated that the balance was

24  $14,813.76.  (Id. Ex. L.)  All four notices required payment by

25  May 10, 2010.

26        In the month following receipt of the April 5, 2010,

27  notices, neither Steve nor Carol Wright called representatives of

28  Century 21.  Carol Wright initially called Shalina Rodriguez, a

14

Director of Financial Services for Century 21, on May 6, 2010. (Compendium of Exhibits Ex. 44 ("Carol Wright Dep.") at 201:22- 203:21, 206:4-16 (Docket No. 107).)  Carol Wright states that in the telephone call she asked for an accounting and "disputed certain discrepancies I saw in the notices of default."  (Carol Wright Decl. ¶ 12.)  Carol Wright "specifically asked what would be required to resolve the claimed default":

> [Rodriguez] informed me that we would need to pay $124,432.20 and that Corporate would want a promissory note since the figure was greater than $100,000.  Our discussion revealed that Corporate was including the outstanding amount allegedly owed under [the Note], even though payment was not required under any of the Franchise Agreements.  The pay-off amount included the Hawaii office even though that franchise was owned by a separate entity.

(Suppl. Carol Wright Decl. in Supp. Of Pls.' Mot. for P.I. ("Suppl. Carol Wright Decl.") ¶ 4 (No. 2:10-2846, Docket No. 13).)

The day after the phone conversation, Carol Wright emailed a letter to Rodriguez identifying the following "items we need to address before proceeding": (1) removing minimum royalty and NAF fees from the Folsom office account balance because it had been closed since August 31, 2009; (2) determining the cutoff date for "final payment calculations," with a possible date of March 31, 2010;[9] (3) "handling" the Hawaii office separately; (4) removing minimum royalty and NAF fees from January, February, and March of 2010; (5) separating the Note amount owed because of a "separate issue" as to why All Professional was not paying it;

---

[9]    This appears to be in reference to a possible payment plan for the amounts owed, with March 31, 2010, being the cutoff date for determining the total amount owed under the payment plan.

1   and (6) crediting $304.50 because of a Century 21 error.

2   (Compendium of Exhibits Ex. 29 (Docket No. 104).)   Lastly, Carol

3   Wright stated that the "totals will obviously have to be

4   recalculated before we can talk about payment arrangements," and

5   said that she would make payments on "April 2010 transactions to

6   start anew."[10]   (Id.)

7         Century 21 accounting guidelines allowed for account

8   managers and directors to arrange alternative payment plans with

9   Century 21 franchisees who were behind on their payments.

10   (Compendium of Exhibits Ex. 45 ("Bertet Dep.") at 26:17-28:14

11   (Docket No. 108).)   Under these guidelines, franchises with less

12   than $100,000 in debt could be offered a deal point agreement (a

13   type of note) and franchises with over $100,000 in debt could be

14   offered an interest bearing note to help them pay off their

15   debts.  (Id. at 26:17-28:25.)   Based on their course of dealings

16   with Century 21, the Wrights believed that they would be offered

17   a payment plan to cure their default.  (Carol Wright Dep. at

18   200:7-201:4.)

19         On June 16, 2010, the Wrights participated in a

20   conference call with account managers Rodriguez and Shawn

21   Holland.  (Id. at 22:4-14.)   During the call, the parties

22   discussed changing the official closing date for the Folsom

23   office in order to reduce minimum fees during that period.  (Id.

24   at 222:5-8.)   In an email dated June 17, 2010, Holland reported

25

26        [10]   While All Professional may have resumed paying royalty

27   fees on current transactions beginning in April of 2010, it still
continued to fail to pay NAF fees on current transactions.

28   (Carol Wright Dep. at 208:17-25.)   Thus, All Professional
continued to fall behind on its franchise fee payments.

that during the call "we managed to resolve her dispute except
for the DAN money.  We are hoping to resolve that matter soon and
prepare 2 separate Deal Point Agreements (one for the Hawaii
office)." (Compendium of Exhibits Ex. 32 (Docket No. 105).)  An
agreement on DAN payments was never reached and Deal Point
Agreements were not issued.

        In letters dated July 7, 2010, Century 21 terminated
the franchise agreements governing the two Sacramento offices and
the Hawaii office, effective July 9, 2010.[11]  (Bertet Decl. Exs.
N-P.)  The letter regarding the River Park Drive office stated
that the account balance was $72,407.97 as of July 6, 2010, an
additional $41,667.00 was owed under the Note, and an additional
$250,029.34 was owed for lost profits, pursuant to calculations
prescribed by the franchise agreement.  (Id. Ex. N.)  The letter
regarding the Florin Road office stated that the account balance
was $33,934.30 as of July 6, 2010, and an additional $155,671.48
was owed for lost profits.  (Id. Ex. O.)  The letter regarding
the Hawaii office stated that the account balance was $21,898.08
as of July 6, 2010, and an additional $80,541.98 was owed for
lost profits.  (Id. Ex. P.)  All Professional was instructed to
follow post-termination procedures and cease using Century 21's
trademarks.  (See id. Exs. N-P.)  The procedures were more fully
described in section 16.4 of the franchise agreements.[12]  Upon

----

[11]    The Folsom franchise had previously been terminated for
abandonment pursuant to Century 21's May 24, 2010, letter.
(Compendium of Exhibits Ex. 31.)

[12]    Section 16.4 requires, inter alia, that franchises (1)
return Century 21's property, (2) discontinue use of Century 21's
Marks, (3) discontinue use of signs or cross arm signposts
displaying Century 21's logo, colors, color patterns and designs

termination of the franchise agreements, Century 21 denied All Professional access to Century 21's server, email accounts, databases, and the Preferred Client Club.  (Steve Wright Decl. ¶ 14; Carol Wright Decl. ¶ 13.)

The Wrights claim not to have anticipated the terminations.  Carol Wright states that, based on her communications with Rodriguez and Holland of Century 21:

> I was lead [sic] to believe that we would receive an accounting of the actual amounts owed and that we would be able to work out a payment plan.  I was ready to cure any default once we were provided with a proper accounting.  I waited for this accounting.  However, I never received an accounting or an adjustment of the amounts owed as I had requested.

(Carol Wright Decl. ¶ 13.)  Steve Wright claims that they were prepared to pay off their debts with Century 21 as soon as a number was finalized.  (Steve Wright Dep. at 222:10-223:7.)  The Wrights' willingness to pay off their account balance appears limited to their willingness to sign a new promissory note with Century 21.  (See, e.g., id. at 222:14 ("We were prepared to sign a Note.").)  During the court's January 11, 2011, evidentiary hearing on a preliminary injunction for this matter, both Carol and Steve Wright stated that they did not have the cash on hand to pay off their account balance.  (See, e.g., Jan. 11, 2011, Tr. at 61:1-3, 70:11-14 ("THE COURT: And the reason you didn't pay for those earlier months is because you didn't have that kind of money, right?  THE WITNESS: Not in that volume, no sir."), 80:10-

or Marks, (4) take any affirmative action necessary to remove any use of Century 21's Marks, (5) "de-identify[]" from Century 21 in a manner that does not confuse the public about the fact that they are no longer associated with Century 21, and (6) remove Century 21's Marks from their web pages.

81:17.)  All Professional now presents bank statements suggesting that it had approximately $150,000 in its bank accounts in May 2010.  (Compendium of Exhibits Ex. 30 (Docket No. 104).)

All Professional also argues that the termination of its franchises took Century 21 employees by surprise.  A July 12, 2010, email from Popp states that he "thought we were getting close on a deal."  (Compendium of Exhibits Ex. 34 (Docket No. 105).)  In response, however, Bainbridge replied, "We're only close on a deal if we're willing to forgive the DAN payments due because he lost those agents to Select."  (Id.)

Following receipt of the July 7, 2010, termination letters, the Wrights sent Century 21 a letter dated July 16, 2010, asking that Century 21 reconsider the termination.  The letter stated "It was never our intention not to pay Century 21 the royalty fees and NAF fees due.  The only part that was in contention was the repayment of the Development Advance Note.  And it was at that point that communications failed."  (Id. Ex. 35.)  Century 21 subsequently denied All Professional's request for reinstatement in a letter dated July 29, 2010.  (Id. Ex. 38.)  In an August 2, 2010, letter, the Wrights wrote that they were "perplexed" by the denial of their request for reinstatement and were "curious as to what this denial of [their] reinstatement was based on since our message to [Rodriguez] was that we were willing to pay what was due Century 21 and that we were willing to sign [Century 21's] note." (Steve Wright Decl. Ex. 5.)

I.   Continuing Use of Century 21 Trademarks

In late August, Century 21 conducted inspections of the Sacramento offices to determine whether All Professional had

19

complied with what it believed were All Professional's post-termination obligations under the franchise agreements.  The reports indicated that All Professional continued to use Century 21's trademarks.  (Bertet Decl. Exs. V-X.)  In a September 17, 2010, letter, Century 21's counsel informed Steve and Carol Wright of the results of the post-termination inspections and demanded that they comply with the post-termination franchise agreement obligations, (Steve Wright Decl. Ex. 6), to which the Wrights responded with a September 21, 2010, letter, proposing terms under which All Professional would continue to be a franchisee of Century 21.  (Id. Ex. 7.)

        All Professional continued to use Century 21's trade dress until after the court issued its preliminary injunction order on January 24, 2011.  On February 11, 2011, All Professional filed a Notice of Appeal of the court's order.  (Docket No. 34.)  On February 23, 2011, the court denied All Professional's Request for Stay and in open court encouraged the parties to agree to a time table for All Professional to de-mark its offices.  (Docket No. 41.)  In a stipulation dated March 8, 2011, the parties agreed that All Professional would have until April 1, 2011, to cease using Century 21's marks on buildings and would cover up Century 21's marks on yard signs by May 1, 2011.  (Compendium of Exhibits Ex. 41 (Docket No. 105).)

     J.   Present Litigation

        On September 30, 2010, Steve Wright, Carol Wright, and All Professional filed an action in state court against Century 21 for violation of a termination provision of the California Franchise Relations Act ("CFRA"), Cal. Bus. & Prof. Code § 20020,

1   violation of California's Unfair Competition Law ("UCL"), Cal.

2   Bus. & Prof. Code §§ 17200-17210, intentional interference with

3   business advantage, breach of contract, breach of the implied

4   covenant of good faith and fair dealing, fraud, negligent

5   interference with business advantage, and interference with

6   contract.  (Notice of Removal Ex. A (No. 2:10-2846, Docket No.

7   1).)  On October 6, 2010, the state court denied Steve Wright,

8   Carol Wright, and All Professional's ex parte application for a

9   temporary restraining order.  (Id. Ex. J.)  With a pending motion

10  for a preliminary injunction against it, Century 21 removed the

11  action to federal court on October 21, 2010.

12          On October 12, 2010, Century 21 filed a separate action

13  in this court against All Professional, Steve Wright, and Carol

14  Wright for claims of federal trademark infringement, 15 U.S.C.

15  § 1114, common law trademark infringement, federal unfair

16  competition, 14 U.S.C. § 1125, California statutory trademark

17  infringement, Cal. Bus. & Prof. Code § 14340, violation of the

18  UCL, breach of contract, breach of guaranty, breach of promissory

19  note, account stated, quantum meruit, and accounting.  (Docket

20  No. 1.)

21          On December 22, 2010, Century 21 filed an additional

22  action against Steve Wright, Carol Wright, and All Professional

23  Hawaii in Morris County, New Jersey, for claims of trademark

24  infringement, 15 U.S.C. § 1114, false designation of origin/

25  false advertising, 15 U.S.C. § 1125(a), trademark dilution, 15

26  U.S.C. § 1125(c), common law unfair competition, breach of

27  contract, breach of guaranty, accounting, and unjust enrichment.

28  (No. 11-2497, Docket No. 1-1.)  All Professional removed the

1  action to federal court on the basis of diversity jurisdiction

2  and Century 21 later stipulated to transferring the matter to

3  this court.  The court consolidated all three actions in orders

4  issued on April 6, 2011, and October 11, 2011.  (See No. Docket

5  Nos. 49, 62.)

6           On November 1, 2010, Century 21 filed a motion for a

7  preliminary injunction requesting that the court enforce All

8  Professional's post-termination obligations under the franchise

9  agreements.  (Docket No. 8.)  Prior to issuing a ruling on the

10 preliminary injunction motion, the court held an evidentiary

11 hearing in which it heard testimony from the parties on January

12 11, 2011.  On January 24, 2011, the court granted Century 21's

13 motion for preliminary injunction and enjoined All Professional

14 from further unauthorized use of Century 21's marks.  (Docket No.

15 28.)

16          Presently before the court is Century 21's motion for

17 summary judgment on its trademark infringement/unfair

18 competition, breach of contract, and breach of guaranty claims,

19 as well as all of All Professional's claims.[13]

20 II.  Requests for Judicial Notice/Evidentiary Objections

21          Century 21 requests that the court take judicial notice

22 of a number of documents previously filed in this case as well as

23 the transcript from the court's January 11, 2011, evidentiary

24 hearing.  All Professional additionally requests that the court

25

26      [13]   Century 21 represents that if the present motion for
   summary adjudication is granted in its entirety, it will dismiss
27 its remaining claims against All Professional.  (Mem. of P. & A.
   in Supp. of Pl.'s Mot. for Summ. Adjudication at 1 n.1 (Docket
28 No. 88-2).)  This would effectively render the present motion for
   partial summary adjudication a motion for summary judgment.

1    take judicial notice of a filed stipulation and agreement in the

2    California Department of Real Estate matter In re: Idalia

3    Lizzette Lombera & Franki Halloran, No. H-5325 SAC, and its

4    notice of appeal from the court's order granting Century 21's

5    preliminary injunction motion.  Because this is a motion for

6    summary judgment, the court may consider these documents without

7    taking judicial notice of them.

8         On a motion for summary judgment, "[a] party may object

9    that the material cited to support or dispute a fact cannot be

10   presented in a form that would be admissible in evidence."  Fed.

11   R. Civ. P. 56(c)(2).  "[T]o survive summary judgment, a party

12   does not necessarily have to produce evidence in a form that

13   would be admissible at trial, as long as the party satisfies the

14   requirements of Federal Rules of Civil Procedure 56."  Fraser v.

15   Goodale, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (quoting Block v.

16   City of Los Angeles, 253 F.3d 410, 418-19 (9th Cir. 2001))

17   (internal quotation marks omitted).  Even if the non-moving

18   party's evidence is presented in a form that is currently

19   inadmissible, such evidence may be evaluated on a motion for

20   summary judgment so long as the moving party's objections could

21   be cured at trial.  See Burch v. Regents of the Univ. of Cal.,

22   433 F. Supp. 2d 1110, 1119-20 (E.D. Cal. 2006).

23        All Professional raises eight objections to portions of

24   two declarations submitted by Century 21 on the grounds of lack

25   of personal knowledge, improper opinion testimony, lack of

26   foundation, improper legal conclusions, and inadmissible hearsay.

27   Century 21 raises eleven objections to portions of Steve Wright's

28   Declaration, (Docket No. 112-3), and twenty objections to

23

1  portions of All Professional's Statement of Additional Material

2  Facts, (Docket No. 112-2), on the grounds of lack of foundation,

3  relevance, speculation, lack of personal knowledge, inadmissible

4  hearsay, and that the statements are conclusory.

5          Objections to evidence on the ground that the evidence

6  is irrelevant, speculative, argumentative, vague and ambiguous,

7  or constitutes an improper legal conclusion are all duplicative

8  of the summary judgment standard itself.  See Burch, 433 F. Supp.

9  2d at 1119-20.  A court can award summary judgment only when

10  there is no genuine dispute of material fact.  It cannot rely on

11  irrelevant facts, and thus relevance objections are redundant.

12  Instead of objecting, parties should argue that certain facts are

13  not material.  Similarly, statements based on speculation,

14  improper legal conclusions, personal knowledge, or argumentative

15  statements are not facts and can only be considered as arguments,

16  not as facts, on a motion for summary judgment.  Instead of

17  challenging the admissibility of this evidence, lawyers should

18  challenge its sufficiency.  Objections on any of these grounds

19  are superfluous, and the court will overrule them.

20          In the interest of brevity, as the parties are aware of

21  the substance of their objections and the grounds asserted in

22  support of each objection, the court will not review the

23  substance or grounds of the individual objections here.  The

24  parties' objections are all overruled.

25  III. Choice of Law

26          As an initial matter, the parties dispute whether New

27  Jersey or California law applies to this dispute.  The contracts

28  at issue each contain a choice of law provision stating:  "This

24

Agreement will be governed by the laws of the state of New Jersey, except that the New Jersey Franchises Practice Act shall not apply to agreements with the Offices located outside of New Jersey." (Bertet Decl. ¶ 17, Exs. A-D § 22.7, at 35.)  All Professional argues that the court should hold that the choice of law provision is unenforceable and instead apply California law in this case.

Both parties agree that California choice of law analysis should govern the enforcement of the choice of law provision.  Under California law, the enforceability of choice of law provisions is governed by the Restatement of Conflicts of Laws and the California Supreme Court's decision in <u>Nedlloyd Lines B.V. v. Superior Court</u>, 3 Cal. 4th 459 (1992).  <u>It's Just Lunch Int'l v. Polar Bear, Inc.</u>, No. Civ. 03-2485, 2004 WL 3406117, at *2 (S.D. Cal. Apr. 29, 2004).  "In determining the enforceability of arm's-length, contractual choice-of-law provisions, California courts shall apply the principles set forth in Restatement section 187, which reflects a strong policy favoring enforcement of such provisions."  <u>Nedlloyd</u>, 3 Cal. 4th at 464-65.

Under <u>Nedlloyd</u>, California will apply the law indicated by the choice of law provision where: "(1) the chosen state has a substantial relationship to the parties or their transaction," or where "(2) there is any other reasonable basis for the parties' choice of law."  <u>Id.</u> at 466.  "If neither of these tests is met, that is the end of the inquiry, and the court need not enforce the parties' choice of law."  <u>Id.</u>  Where either test is met, the court proceeds to the second step and "determine[s] whether the

25

1  chosen state's law is contrary to the fundamental policy of
2  California."   Id.   If there is no conflict of this nature, the
3  choice of law provision must be enforced.   Id.

4       Where "there is a fundamental conflict with California
5  law," the court proceeds to the third step and "determine[s]
6  whether California has a materially greater interest than the
7  chosen state in the determination of the particular issue.   If
8  California has a materially greater interest than the chosen
9  state, the choice of law shall not be enforced, for the obvious
10 reason that in such circumstance we will decline to enforce a law
11 contrary to this state's fundamental policy."   Id. (internal
12 citations and quotations marks omitted).

13       A.   Substantial Relationship

14       Applying the Nedlloyd test here, the court must first
15 determine "whether the chosen state has a substantial
16 relationship to the parties or their transaction . . . ."   Id.
17 This requirement is satisfied because Century 21 has a
18 substantial relationship with New Jersey because it is a limited
19 liability company with its principal place of business and
20 headquarters in New Jersey.   See Nedlloyd, 3 Cal. 4th at 467
21 (citing Restatement of Conflicts of Laws § 187 cmt. f); It's Just
22 Lunch Int'l LLC v. Island Park Enter. Grp., Inc., No. EDCV 08-
23 367-VAP, 2008 WL 4683637, at *2 (C.D. Cal. Oct. 21, 2008).

24       Moreover, Century 21's New Jersey residence provides a
25 "reasonable basis" for a contractual provision requiring
26 application of New Jersey Law.   "If one of the parties resides in
27 the chosen state, the parties have a reasonable basis for their
28 choice."   Consul Ltd. v. Solide Enters., Inc., 802 F.2d 1143,

1  1147 (9th Cir. 1986).

2        B.   <u>Fundamental Policy</u>

3        The court next considers whether application of New

4  Jersey law would be contrary to "a fundamental policy" of

5  California.  There is no bright-line definition of a "fundamental

6  policy."  Restatement of Conflict of Laws § 187 cmt. g.  A

7  fundamental policy must be "substantive," and "may be embodied in

8  a statute which makes one or more kinds of contracts illegal or

9  which is designed to protect a person against the oppressive use

10  of superior bargaining power."  <u>Id.</u>

11        Here, All Professional's eighth cause of action is

12  based on the CFRA, which "serves to protect California

13  franchisees, typically small business owners and entrepreneurs,

14  from abuses by franchisors in connection with the nonrenewal and

15  termination of franchises."  <u>1-800-Got Junk? LLC v. Superior</u>

16  <u>Court</u>, 189 Cal. App. 4th 500, 516 (2d Dist. 2010).  Courts are

17  required to construe "the CFRA broadly to carry out legislative

18  intent, that intent . . . is to protect franchise investors, i.e.

19  those who 'pay for the right to enter into a business.'"  <u>Thueson</u>

20  <u>v. U-Haul Int'l, Inc.</u>, 144 Cal. App. 4th 664, 673 (1st Dist.

21  2006).  The CFRA's provisions "apply to any franchise where

22  either the franchisee is domiciled in this state or the

23  franchised business is or has been operated in this state."  Cal.

24  Bus. & Prof. Code § 20015.

25        The legislature was so concerned that the CFRA

26  statutory protections be provided to all franchisees that it

27  created an antiwaiver provision, which states that "[a]ny

28  condition, stipulation or provision purporting to bind any person

27

1   to waive compliance with any provision of this law is contrary to

2   public policy and void."  Cal. Bus. & Prof. Code § 20010.

3   Section 20010 though "only voids a choice of law provision which

4   requires a franchisee to 'waive compliance' with the protections

5   of the CFRA."  1-800-Got Junk?, 189 Cal. App. 4th at 518.  The

6   critical inquiry is therefore whether the enforcement of the New

7   Jersey choice of law provision would diminish the rights that All

8   Professional would otherwise have under the CFRA.

9           In this case, All Professional brings a claim under the

10  CFRA provision that prohibits termination of a franchise without

11  good cause and requires that the franchisee be given a reasonable

12  opportunity to cure.  See Cal. Bus. & Prof. Code § 20020.  It is

13  true that there is similar New Jersey statute, but it would not

14  provide such protections in this case because the New Jersey

15  Franchise Act does not cover franchisees that do not maintain a

16  franchise location in New Jersey.  See N.J. Stat. 56:10-4.

17  Application of New Jersey law, however, would not effectuate a

18  waiver of All Professional's protections under the CFRA because

19  the CFRA provision's good cause and opportunity to cure

20  requirements are incorporated into All Professional's franchise

21  agreements with Century 21.  (See Bertet Decl. Exs. A-D

22  § 16.2.4.)  Application of the CFRA would thus provide no greater

23  protection of All Professional than the franchise agreements

24  themselves.  Application of New Jersey law would therefore not

25  diminish All Professional's rights because any claims that All

26  Professional may have under the CFRA can be pursued as breach of

27

28

                                    28

1   contract claims under the franchise agreements.[14]   Accordingly,

2   the choice of law provision is enforceable and the court will

3   apply the laws of New Jersey.[15]

4   IV.   Discussion

5          Summary judgment is proper "if the movant shows that

6   there is no genuine dispute as to any material fact and the

7   movant is entitled to judgment as a matter of law." Fed. R. Civ.

8   P. 56(a).[16]   A material fact is one that could affect the outcome

9   of the suit, and a genuine issue is one that could permit a

10  reasonable jury to enter a verdict in the non-moving party's

11  favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

12  (1986).  The party moving for summary judgment bears the initial

13

14          [14]   All Professional additionally claims, without providing
    any analysis or authority, that the limited waivers in the 2006
15  addenda violate the antiwaiver provision in the CFRA.  These
    limited waivers do not serve to reduce any of All Professional's
16  rights under the CFRA, however, because the CFRA provisions
    remain incorporated in the franchise agreements so breach of
17  contract claims may still be brought.  Furthermore, the only
    claims that All Professional raises under the CFRA, namely
18  regarding the termination of the franchises, occurred after All
    Professional signed the limited waivers.

19          [15]   All Professional does not suggest that application of
20  New Jersey law would violation a fundamental California public
    policy for any claims other than its CFRA claim.  Absent
21  interference with a fundamental public policy, "[t]he mere fact
    that the chosen law provides greater or lesser protection than
22  California law would, are not reasons for applying California
    law." Medimatch Inc. v. Lucent Techs. Inc., 120 F. Supp. 2d 842,
23  862 (N.D. Cal. 2000).  Application of New Jersey law will
    undermine All Professional's statutory claim under California's
24  UCL, however, courts have held that application of a choice-of-
    law provision that bars a UCL claim does not violate a
25  fundamental California public policy.  See, e.g., Abat v. Chase
    Bank USA, N.A., 738 F. Supp. 2d 1093, 1096 (C.D. Cal. 2010); It's
26  Just Lunch, 2008 WL 4683637, at *4.

27          [16]   Federal Rule of Civil Procedure 56 was revised and
    rearranged effective December 1, 2010.  However, as stated in the
28  Advisory Committee Notes to the 2010 Amendments to Rule 56,
    "[t]he standard for granting summary judgment remains unchanged."

burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Alternatively, the moving party can demonstrate that the non-moving party cannot produce evidence to support an essential element upon which it will bear the burden of proof at trial. Id.

Once the moving party meets its initial burden, the burden shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting then-Fed. R. Civ. P. 56(e)).  To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor.  Id. at 255.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . ." Id.

    A.   Century 21's Claims

        1.   Breach of Contract

1    To state a claim for breach of contract under New

2  Jersey law, there must be proof of "(1) a contract between the

3  parties, (2) a breach of that contract, (3) damages flowing

4  therefrom; and (4) that [the plaintiff] performed its own

5  contractual obligations." <u>Frederico v. Home Depot</u>, 507 F.3d 188,

6  203 (3d Cir. 2007).  Century 21 brings its claim for breach of

7  contract on the basis that All Professional and All Professional

8  Hawaii defaulted under the terms of the franchise agreements by

9  failing to pay their franchise fees.  All Professional does not

10  dispute that it failed to pay franchise fees pursuant to the

11  franchise agreements, but argues that it was excused from fully

12  performing in the face of Century 21's breaches of the

13  agreements.  The court will address the terms of the franchise

14  agreements and then will consider each of Century 21's alleged

15  breaches in turn.

16    a.   <u>Interpreting the Franchise Agreement</u>

17    "The primary standard governing the interpretation of

18  an integrated agreement is to use 'the meaning that would be

19  ascribed to it by a reasonably intelligent person who was

20  acquainted with all the operative usages and circumstances

21  surrounding the making of the writing.'" <u>YA Global Invs., L.P.</u>

22  <u>v. Cliff</u>, 419 N.J. Super. 1, 11 (App. Div. 2011) (quoting

23  <u>Deerhurst Estates v. Meadow Homes, Inc.</u>, 64 N.J. Super. 134, 149

24  (App. Div. 1960)).  On a motion for summary judgment, a court may

25  properly interpret a contract as a matter of law only if the

26  meaning of the contract is unambiguous.  <u>Miller v. Glenn Miller</u>

27  <u>Prods., Inc.</u>, 454 F.3d 975, 990 (9th Cir. 2006) (citation

28  omitted).

1    Under New Jersey law, "[e]vidence of the circumstances

2  is always admissible in aid of the interpretation of an

3  integrated agreement.  This is so even when the contract on its

4  face is free from ambiguity."  <u>Halper v. Halper</u>, 164 F.3d 830,

5  840 (3d Cir. 1999) (quoting <u>Alt. N. Airlines v. Schwimmer</u>, 12

6  N.J. 293, 301 (1953)).  Although extrinsic evidence is permitted

7  to determine the meaning of contractual terms, after the meaning

8  of the contract is discerned the parol evidence rule "prohibit[s]

9  the introduction of extrinsic evidence to vary the terms of the

10  contract."  <u>Conway v. 287 Corporate Ctr. Assocs.</u>, 187 N.J. 259,

11  270 (2006).  Summary judgment is inappropriate if the court

12  cannot determine the parties' intent at the time of contracting

13  without judging the credibility of the extrinsic evidence.  See

14  City of Hope Nat. Med. Ctr. v. Genentech, Inc., 43 Cal. 4th 375,

15  395 (2008).

16    In this case, All Professional does not dispute that

17  the franchise agreements are integrated agreements.  (<u>See</u> Bertet

18  Decl. Exs. A-D § 22.15.)  The only provision of the agreements

19  that All Professional suggests is ambiguous is section 4.1, which

20  states, in pertinent part:

21    **License, Policy and Procedure Manual**.  As of the
     Effective Date, we grant you a nonexclusive license (I)
22    to use the Marks for the Business at and from the Office
     and to hold the Business out to be a participant in the
23    System, and (ii) to use the System for the operation of
     the Business at and from the Office.   You accept the
24    nonexclusive license granted by us, subject to the terms
     and conditions of this Agreement and the P&P Manual as
25    amended from time to time. . . . The P&P Manual contains
     our recommended methods, specifications and procedures
26    relating to the use and protection of the System.

27  (<u>Id.</u> Exs. A-D § 4.1.)  The agreements define "System" to mean

28    the business format and methods developed or licensed by

32

us for the promotion and assistance of independently owned and operated real estate brokerage offices, including policies, procedures, and techniques designed to enable such offices to compete more effectively in the real estate sales market.  The System includes common use and promotion of certain Marks, copyrights, trade secrets, centralized advertising programs, recruiting programs, referral programs and sales and management training programs.  We may update the System at any time and expect to continue to do so as we deem advisable in our sole judgment and discretion.

(Id. Exs. A-D § 3.1.14.)

All Professional contends that Century 21's use of the term "System" is ambiguous and argues that "[a] reasonable interpretation of the Century 21 drafted Agreement is that the 'System' includes a promise to prevent intra family recruiting, preserve the financial privacy of a franchisee and to protect the Century 21 service mark."  (Opp'n to Summ. Adjudication at 27:27-28:1 (Docket No. 93).)  All Professional does not explain why application of the definition provided in the agreements for the term "System" would produce an ambiguous result, nor why its proposed interpretation is reasonable.

The plain and clear language of section 4.1 grants the franchisee a non-exclusive license to use Century 21's marks and system.  The definition of "system" provided in the agreements, which encompasses use of Century 21's marks, copyrights, trade secrets, and advertising programs, is consistent with the plain purpose of section 4.1.  All Professional's proposed definition of "System," which would obligate Century 21 to prevent intra family recruiting, preserve financial privacy, and protect Century 21's service mark, is inconsistent with the plain meaning of section 4.1 in defining the scope of the non-exclusive license because it places affirmative obligations upon Century 21, rather

than defining All Professional's rights under the non-exclusive license.

All Professional's proposed definition of "System" also contradicts other provisions in the franchise agreements. Section 4.4.1 provides that "You shall be responsible for, and supervise all of your Affiliates in order to assure, the proper use of the Marks and the System in compliance with this Agreement." (Bertet Decl. Exs. A-D § 4.4.1.)  Section 21.2 further provides that Century 21 has "no right to regulate or participate in the recruitment, selection, engagement, retention, discipline, or termination of your sales associates or employees." (Id. Exs. A-D § 21.2.)  These terms place the obligation to enforce compliance with Century 21's proposed recruiting practices on All Professional and suggest that inserting an obligation into the term "System" for Century 21 to manage a franchisee's employment practices is inconsistent with other terms in the agreement.

Finally, nothing All Professional has submitted regarding the circumstances surrounding the franchise agreements supports their proposed definition or claims that the agreements are ambiguous.  Based on the evidence submitted, section 4.1 of the franchise agreements is not susceptible to more than one meaning and is therefore not ambiguous.  The court can thus interpret the contracts as a matter of law.

        b.    All Professional's Allegations that Century 21 Breached the Contract and Excused All Professional's Performance Under the Franchise Agreements

34

1    All Professional submits a number of ways in which it

2 alleges that Century 21 breached the franchise agreements in a

3 manner that excused its performance.[17]   The court will address

4 each alleged breach in turn.

## 1.   Improper Recruiting

6    The Century 21 Code of Conduct states that "[t]he

7 Franchisee and its Office Personnel should avoid recruiting

8 (which shall include, but shall not be limited to, personal

9 solicitations, mass mailings, personal mailings, and/or

10 advertising), other CENTURY 21 Franchisees' Sales Associates

11 unless the other CENTURY 21 Franchisee first consents to such

12 recruiting activities." (Compendium of Exhibits Ex. 15 ("Code of

13 Conduct") at 24 (Docket No. 103).)   All Professional argues that

14 Century 21 breached the franchise agreements when it failed to

15 stop other franchises from recruiting its agents.   As a result of

16 this breach, All Professional claims that its revenues dropped,

17 rendering it unable to, and therefore excused from, paying its

18 franchise fees.

19    With respect to Steve Wright's complaints to Century

20 21, Century 21 had no obligation under the agreements to prevent

21 other franchisees from recruiting All Professional's agents.   To

22 the contrary, Century 21 did not have the right to do so.   As

23

24    [17]   Of the eight ways that All Professional stated in its
interrogatory responses that Century 21 breached the franchise
25 agreements, All Professional does not discuss three alleged
breaches in its opposition.   (See Rudin Decl. ¶¶ 5-6, Exs. D-E.)
26 Specifically, All Professional does not address Century 21's
alleged failure to: (1) utilize NAF fees to promote All
27 Professional, (2) provide relocation referrals, or (3) prevent
All Professional Hawaii partner John Sherman from leaving All
28 Professional and joining a competing franchise.   The court
accordingly does not address these claims.

35

discussed above, section 21.2 provided:

> [Century 21] will have no obligation to pay your commissions, taxes, wages or other expenses, and will have no right to regulate or participate in the recruitment, selection, engagement, retention, discipline or termination of your sales associates or employees, . . . except as may be necessary to protect the Marks and goodwill.

(Bertet Decl. Exs. A-D § 21.2.)  This provision applied to all of Century 21's franchise agreements, and therefore also governed its relationship with Select and All Islands.  The remedy, as this court explained previously, was for All Professional to sue Select, the Century 21 franchisee that allegedly recruited All Professional's agents and moved into the same Folsom office that All Professional vacated.[18]

Century 21 did not have the right to run either All Professional's or Select's business.  It was at best in the position of mediator, with no authority to enforce sanctions against either party.  Regardless of Century 21's actions, Select's alleged recruiting of All Professional's agents was no excuse for All Professional to stop paying fees to Century 21.

---

[18]   All Professional suggests that under section 10.3 of the franchise agreements, Century 21 had the discretion to terminate franchises that engaged in unethical recruiting behavior.  (See Bertet Decl. Exs. A-D § 10.3.)  As an initial matter, it is unclear whether this provision applies to recruiting violations based on Century 21's Code of Conduct, which is discussed in section 10.2.  Section 10.3 discusses compliance with the Code of Ethics of the National Association of Realtors, local, state, and federal law.  A reasonable interpretation of the termination provision is that Century 21's discretion to terminate franchises is limited to transactions violating these provisions, and not Century 21's internal code. Even if Century 21 had the discretion to terminate franchises for violations of recruiting practices, the provision does not obligate Century 21 to take any action, rather it may do so "at [its] option."  (Id.)  All Professional's reliance on this provision therefore fails to demonstrate a material fact suggesting breach of contract.

2.   <u>Divulging of Confidential Information</u>

All Professional alleges that Century 21 released confidential information regarding its finances that undermined its agents' confidence in the franchise and encouraged other franchises to recruit All Professional's agents.[19]   (<u>See</u> Steve Wright Dep. II at 72:16-73:24.)   The only provision in the franchise agreements that addresses Century 21's obligations regarding All Professional's confidential information is section 13.5.   Section 13.5 provides that "no information supplied to us shall be considered confidential by the parties." (Bertet Decl. Exs. A-D § 13.5.)

All Professional argues instead that the term "System" in section 4.1 should be construed to place an obligation on Century 21 to protect All Professional's information from disclosure.   As the court discussed above, such an interpretation is inconsistent with the plain meaning of section 4.1 and would flatly contradict section 13.5.   Because Century 21 had no duty to protect All Professional's confidential information under the franchise agreements, any information allegedly divulged cannot be used to establish a breach of contract or as an excuse for All Professional to stop paying its franchise fees.

3.   <u>Failing to Protect the Century 21 Name</u>

---

[19]   The only evidence supporting All Professional's claim that its confidential information was divulged by Century 21 is hearsay testimony in the form of Steve Wright's uncorroborated deposition.   Steve Wright acknowledged that he never heard any Century 21 agent reveal the information nor did he ever see the statements in writing, but stated that it must have been Bainbridge who divulged the information.   (Rudin Decl. Ex. A ("Steve Wright Dep. III") at 254:23-259:17 (Docket No. 88-9).) Bainbridge denied having shared All Professional's financial information.   (Bainbridge Dep. at 191:20-195:23.)

1    All Professional alleges that Century 21's failure to
2 protect its name and marks violated the franchise agreement and
3 that the resulting consumer confusion caused All Professional to
4 lose business.  All Professional fails to direct the court's
5 attention to any provision in the franchise agreements that
6 imposes an obligation on Century 21 to protect the Century 21
7 name from infringement by third parties.  Once again, All
8 Professional relies on its reinterpretation of the term "System"
9 in section 4.1 to impose such an obligation on Century 21.
10 Section 4.1 cannot be reasonably interpreted to impose an
11 affirmative obligation on Century 21 to initiate third-party
12 lawsuits based on All Professional's complaints.

13    Instead, section 4.4.2 provides that Century 21
14 "reserve[s] the right to approve any and all public uses of the
15 Marks . . . . At our sole option, we or an affiliate will obtain
16 and maintain its registrations for the Marks and exercise the
17 rights against infringement or unauthorized use of the Marks."
18 (Id. Exs. A-D § 4.4.2.)  The language of section 4.4.2 suggests
19 that Century 21 retains the discretion to decide when to take
20 action against infringers.  All Professional's interpretation of
21 section 4.1 contradicts the discretion that Century 21 is given
22 under section 4.4.2 and would therefore be an unreasonable
23 interpretation.  Because Century 21 has no affirmative duty to
24 prosecute entities that infringe upon its Mark, Century 21's
25 alleged inaction cannot be used to establish that it breached the
26 franchise agreements.

27                    4.   Facilitating Select's Move to Folsom
28    Section 5.2 of the franchise agreements provides that

                              38

"during the term of this agreement, [Century 21] shall not grant another franchised CENTURY 21 office at a location which is within .25 mile . . . of [All Professional's] Office." (Id. Exs. A-D § 5.2.)  All Professional argues that Century 21 breached the franchise agreement when it allowed Select to move into the Folsom office that All Professional had previously used.[20]  At the time that Century 21 approved Select's application to move to Folsom, All Professional's Folsom franchise had already been terminated on the grounds of abandonment.  Therefore, Century 21 did not violate section 5.2 of the franchise agreement.  All Professional points to no other provisions in the franchise agreements that suggest that Century 21 was barred from permitting Select's move to Folsom.

5.  <u>Failing to Provide the "Tools and Systems" Promised</u>

All Professional alleges that Century 21's failure to provide "tools and systems" excused All Professional's performance under the franchise agreements.  It is unclear to the court what "tools and systems" All Professional is referring to, but it appears that All Professional believes that the "tools and systems" would increase its productivity.  Once again, All Professional fails to cite the provision of the franchise agreement it is relying on for this claim.

Section 23.9 of the franchise agreements states that All Professional "acknowledge[s] that neither [Century 21], nor

---

[20]   The court addresses below whether Century 21's termination of All Professional's Folsom franchise was proper under the franchise agreement.

any other person has guaranteed or warranted that you will

succeed in the operation of the Franchise . . . ."  Similarly,

section 23.10 of the franchise agreements states that All

Professional acknowledges that Century 21 "neither orally or in

writing represented any specified level of sales or profit."  As

discussed above, reading a obligation into section 4.1 that

Century 21 provide "tools and systems" to ensure profitability is

incompatible with the section's clear meaning and other

provisions of the agreement.

Assuming that the franchise agreements did require

Century 21 to provide All Professional with "tools and systems,"

All Professional has failed to raise a genuine issue of material

fact showing that Century 21 failed to provide the required

"tools and systems."  Rather, All Professional's argument and

evidence relies on the circular reasoning that because it was not

profitable, Century 21 must have failed to provide it will

sufficient "tools and systems."  Such tautology is not enough to

defeat a motion for summary adjudication.  It is clear from the

evidence that All Professional was provided with various tools

and systems, such as the lead router, which All Professional

found important enough to move this court for a preliminary

injunction requiring Century 21 to allow it continued access to

the Century 21 system.

6.   Preventing All Professional from Curing
                its Defaults

All Professional argues that Century 21 prevented it

from curing its defaults by not properly accounting for All

Professional's overdue fees, failing to provide it with a payment

40

plan, and then terminating the franchises without notice.

All Professional's Folsom franchise was terminated under the franchise agreement's abandonment clause, section 16.2.5.4, for failure to operate the office for more than five consecutive business days.  Abandonment is a non-curable default for which Century 21 can terminate a franchise without notice. (Bertet Decl. Exs. A-D § 16.2.5.)  It is unclear how Century 21 could have acted to prevent All Professional from curing its breach since it was within All Professional's sole control to reopen its Folsom office -- Century 21 did not own the premises or evict All Professional.  If anything, by waiting more than six months to terminate All Professional's Folsom franchise, Century 21 gave All Professional more time to cure its abandonment breach than it was required to under the franchise agreement.

The Sacramento and Hawaii franchises were terminated after All Professional failed to cure its defaults by the May 10, 2010, deadline set in the April 5, 2010, notice of default letters.  As the court discussed in its preliminary injunction order, All Professional's negotiations with Century 21 to create an alternative payment plan did not relieve All Professional of its obligation to pay its default in full by the cure date.[21] Century 21 was under no obligation to enter into such discussions or provide a payment plan.

---

[21]   The fact that the Wrights did not even attempt to contact Century 21 until May 6, 2010, four days before the cure date, to set up a payment plan and dispute the account totals is further evidence that All Professional's failure to act before the cure date is its own fault.  With the exception of the Wrights' initial discussions with Century 21 on May 6 and May 7, all of the discussions that All Professional relies upon occurred after the cure date.

41

1    Since the preliminary injunction hearing All

2   Professional has provided additional details regarding the terms

3   of its negotiation with Century 21.  None of this evidence though

4   suggests that All Professional ever reached a deal with Century

5   21 regarding a payment plan or that Century 21 made any

6   representations to All Professional that it should wait to pay

7   off any portion of its default until after an agreement was

8   reached.  The evidence does suggest that the majority of the

9   overdue franchise fees were undisputed and that All Professional

10  failed to pay even the undisputed fees.

11    It was unequivocally clear from the testimony of the

12  Wrights during the evidentiary hearing on the preliminary

13  injunction motion that the primary reason they did not pay the

14  franchise fees they owed to Century 21 was that they did not have

15  the money to do so.  It was not because All Professional did not

16  know the amount to pay nor was it because Century 21 had

17  defaulted on its obligations.

18    The Wrights now present evidence that suggests that

19  they did have adequate funds to pay the franchise fees that they

20  owed.  (Compendium of Exhibits Ex. 30.)  This new evidence

21  directly contradicts the Wrights' repeated sworn assertions

22  during the evidentiary hearing that they did not have the funds

23  available to pay off their default and their claim that the

24  Folsom office was closed due to cash flow problems.  Regardless

25  of this new evidence, All Professional provides no evidence

26  showing that Century 21 prevented it from paying off its accounts

27  directly with cash.  All Professional has failed to provide any

28  material facts suggesting that Century 21 prevented it from

curing its breach and excusing its obligation to perform under the franchise agreements.

### 7. Terminating Franchise Agreements in Bad Faith

Finally, All Professional argues that Century 21 terminated the franchise agreements in bad faith because the terminations for non-payment and abandonment were actually "pretext" for Century 21's ulterior motives. All Professional's argument appears to be premised on the assumption that if Century 21 terminated the contracts in bad faith, Century 21 was in breach of contract. It is not clear how this would function to otherwise excuse All Professional's performance under the franchise agreements. In support of its argument that termination of a franchise agreement pursuant to its express terms is invalid if there is some pretextual motive, All Professional cites section 20020 of the CFRA[22] and JRS Products, Inc. v. Matushita, Electric Corp. of America, 115 Cal. App. 4th 168, 173 (2004).

Section 20020 of the CFRA prohibits termination of a franchise without good cause and requires that the franchisee be given a reasonable opportunity to cure. See Cal. Bus. & Prof. Code § 20020. All Professional's argument appears to rely on the interpretation of "good cause" as including a "good faith," as

---

[22]    Application of New Jersey law in this case technically bars consideration of claims under the CFRA. However, the protections in section 20020 of the CFRA also appear in sections 16.2.3 and 16.2.4 of the franchise agreements. Interpretation of All Professional's argument based on the specific provisions in the franchise agreements would therefore produce the same analysis and conclusion.

opposed to "bad faith," requirement. "Good cause" is defined in section 20020 of the CFRA to "include, but not be limited to, the failure of the franchise to comply with any lawful requirement of the franchise agreement after being given notice thereof and a reasonable opportunity, which in no event need be more than 30 days, to cure the failure." Id. The CFRA makes no mention of a "good faith" requirement and All Professional fails to cite any caselaw suggesting such a requirement. Under section 20020, Century 21's termination of All Professional's franchises was in good faith because Century 21 provided All Professional with more than 30 days to cure its default. All Professional's reliance on JRS Products is similarly of no help as the decision does not discuss pretextual termination at all.

        "If a party has a legal right to terminate the contract . . . , its motive for exercising that right is irrelevant. The party can seize on a ground for termination given it by the contract to terminate the contract for an unrelated reason." Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp., 223 F.3d 585, 589 (7th Cir. 2000). It is entirely possible that if All Professional's relationship with Century 21 had been better, Century 21 may have been inclined to work harder to maintain or restore All Professional's franchises. Regardless of Century 21's motives leading up to the termination of All Professional's franchises, though, the terminations were properly conducted under the franchise agreements and therefore Century 21's motive is irrelevant.

        All Professional further claims that the termination of its Folsom franchise was "patently a pre-text" because the

44

1  termination violated the terms of the franchise agreement's

2  abandonment clause.  (Opp'n to Mot. for Summ. Adjudication at

3  29:13-14.)  Section 16.2.5 of the franchise agreements provides

4  that:

5      Abandonment of your Office(s), demonstrated by removal of
       the Marks or by your not operating the Business for five
6      consecutive business days or any shorter period when,
       under the facts and circumstances, it would not be
7      unreasonable for use to conclude that you do not intend
       to continue to operate the Business.

8

9  (Bertet Decl. Exs. A-D § 16.2.5.)  All Professional argues that

10 it was not reasonable for Century 21 to conclude that they no

11 longer intended to operate the Folsom office and therefore they

12 did not abandon the franchise.

13      All Professional interprets section 16.2.5 to require

14 proof that the franchisee does not intend to continue to operate

15 the business when the office has not been operational for five

16 business days or more.  A plain reading of section 16.2.5 only

17 requires a determination of whether the franchise intends to

18 continue operation of the business where the office has not been

19 operational for less than five days.  To interpret the section as

20 stating otherwise would render the provision's distinction

21 between a business that has not operated for five consecutive

22 business days and one that has not operated for a shorter period

23 meaningless because Century 21 would always be required to

24 undergo analysis of the "facts and circumstances."  All

25 Professional's interpretation thus fails to give meaning to the

26 entirety of the provision and is not reasonable.

27      Century 21 properly terminated the Folsom franchise

28 after All Professional failed to conduct business out of the

45

1   office, or any other Folsom office, for over six months.  The

2   termination was therefore not "patently a pre-text."

3          The court further notes that even if the termination of

4   All Professional's Folsom franchise was improper under the

5   franchise agreement's abandonment clause, the termination would

6   have been proper had Century 21 relied on All Professional's

7   failure to cure its default on the Folsom franchise.  The April

8   5, 2010, notice of default on the Folsom franchise specified a

9   cure date of May 10, 2010.  (Bertet Decl. Ex. J.)  Century 21 did

10  not terminate All Professional's Folsom office on abandonment

11  grounds until May 24, 2010, (Compendium of Exhibits Ex. 31), well

12  after the cure date.

13         All Professional has failed to demonstrate that Century

14  21 was in breach of the franchise agreement in any manner.  All

15  Professional's performance under the agreements was therefore not

16  excused.  Accordingly, the court will grant Century 21's motion

17  for summary adjudication of its claim that All Profession was in

18  breach of contract with respect to the four franchise agreements.

19              c.   Breach of the DAN Agreement

20         Century 21's breach of contract claim also includes

21  breach of the DAN agreement by All Professional for failure to

22  make required payments.  Under the DAN agreement, All

23  Professional received a $75,000 loan, repayment of which would be

24  waived in each year that All Professional reached a minimum

25  threshold in gross revenues.  All Professional did not reach the

26  minimum threshold in gross revenue for three separate years, yet

27  it never made any of the required payments under the DAN.  All

28  Professional does not dispute these facts, but instead argues

46

that its failure to make the required payments under the DAN

should be excused or were otherwise not required.

Under New Jersey law, a written contract is considered integrated "when the parties intend it to constitute the complete and final expression of their agreement.  When a contract lacks an express integration clause the district court must determine whether the parties intended their agreement to be an integrated contract by reading the writing in light of the surrounding circumstances."  Rite Aid of N.J., Inc. v. United Food & Commercial Workers, Civ. No. 11-00374, 2011 WL 5920939, at *6 (D.N.J. Nov. 28, 2011) (quoting Starter Corp. v. Converse, Inc., 170 F.3d 286, 295 (2d Cir. 1999)).

The parties dispute whether the DAN is an integrated contract.  The agreement does provide that All Professional "acknowledges and agrees that neither [Century 21] nor any of its affiliates has made any representations or warranties, nor furnished any information to them concerning any aspect of the Franchise Agreements or [All Professional's] business."  (Bertet Decl. Ex. E at CENT000294.)  This provision, however, is included in a paragraph that begins by limiting its applicability to situations where the "Note is being executed in connection with the acquisition or consolidation (by merger, acquisition or otherwise) of a real estate brokerage business."  (Id. Ex. E at CENT000293-CENT000294.)  Although the specific sentence that Century 21 relies upon does not specifically contain this limitation, it appears at the end of a paragraph that repeatedly limits its contents to DANs signed in connection with an acquisition or consolidation.  The DAN agreement in this case was

47

1  not signed in connection with the acquisition or consolidation of

2  a franchise, therefore it would be reasonable to read the

3  limitation on the effect Century 21's representations as not

4  applying in this case.  The court will thus consider the

5  surrounding circumstances.[23]

6         All Professional points to statements made by Omer,

7  Century 21's Western Regional Vice President, at the time it

8  signed the DAN suggesting that the Wrights were "not to worry"

9  about repaying the DAN because of the new "tools and systems"

10 that Century 21 was developing.  All Professional argues that

11 after it signed the DAN, Century 21 began to provide less

12 support, never provided the "tools and systems" promised, and

13 began to allow other franchises to steal All Professional's

14 agents.  The court has already addressed these complaints --

15 Century 21 met its obligations under the franchise agreements and

16 did not guarantee that All Professional would be profitable.  As

17 Steve Wright himself conceded, Omer never "said that we would be

18 profitable.  They said we would be more productive and sell more

19 houses."  (Steve Wright Dep. I at 67:11-15.)

20        Aside from All Professional's evidence regarding Omer's

21 representations, the surrounding circumstances support the direct

22 application of the DAN provision that failure to meet gross

23 revenue thresholds would require DAN payments.  At the time that

24 All Professional and the Wrights signed the DAN agreement, they

25 also executed a Security Agreement and an Amendment to the River

26

27        [23]   As the court noted above, even if the DAN were an
   integrated agreement, review of the surrounding circumstances
28 would be appropriate under New Jersey law.  See Halper, 164 F.3d
   at 840-41.

1  Park franchise agreement that contained provisions specifically

2  pertaining to repayment of the DAN.  These agreements, which do

3  contain integration clauses, and the plain language in the DAN

4  agreement regarding the circumstances under which DAN payments

5  would be required suggest that there would be circumstances under

6  which a franchise would not meet its gross revenue threshold and

7  would be required to repay a portion of the DAN.  All

8  Professional's proposed interpretation of the DAN as placing an

9  affirmative obligation on Century 21 to provide "tools and

10 systems" so that All Professional would always meet the gross

11 revenue threshold, or to waive the DAN payments, is inconsistent

12 with this evidence.  Because Century 21 had no obligation to

13 ensure that All Professional never had to repay the DAN, All

14 Professional's failure to perform under the DAN agreement is not

15 excused.

16         Accordingly, the court will grant Century 21's motion

17 for summary adjudication for its claim that All Professional was

18 in breach of contract with respect to the DAN agreement.

19               d.   Actual Damages

20         Consideration of damages is appropriate because the

21 court has found that All Professional was in breach of contract

22 of both the franchise agreements and the DAN and has granted

23 Century 21's motion for summary adjudication.  The parties

24 dispute the amount of damages that Century 21 is entitled to in

25 compensation for All Professional's breach of the franchise

26 agreements.  Century 21 claims that All Professional currently

27 owes past due franchise and advertising fees totaling

28 $196,954.90.  All Professional raises a number of objections to

49

1   the charges.  The court will address each objection in turn.

2          First, All Professional objects to Century 21's

3   accounting for the River Park, Florin Road, and Hawaii franchises

4   because it alleges that it was prevented from paying past due

5   service fees after Century 21 terminated support services.

6   (Steve Wright Decl. in Supp. of Defs.' Opp'n to Mot. for Summ.

7   Adjudication ("Steve Wright Decl. II") ¶¶ 4, 6-7 (Docket No.

8   95).)[24]  The fact that All Professional no longer had access to

9   Century 21's online payment system after its franchises were

10  terminated neither excuses its failure to pay its past-due

11  franchise fees nor constitutes a disputed material fact regarding

12  the amount ultimately due.

13         All Professional next objects to any portion of the DAN

14  being due on account of Century 21 "withholding services

15  essential to maintain production."  (Id. ¶ 4.)  The court has

16  already dismissed this objection above.

17         Third, All Professional disputes the accounting for NAF

18  advertising fees for the River Park franchise.  Specifically, All

19  _____

20        [24]   Century 21 objects to the evidence presented by All
    Professional to dispute the amounts owed under the franchise
21  agreements.  The only evidence submitted by All Professional is
    paragraphs four through seven of Steve Wright's July 16, 2012,
22  declaration.  (Docket No. 95.)  In Steve Wright's June 11, 2012,
    deposition testimony he stated that other than All Professional's
23  objection to the DAN charges, he did not know which accounting
    charges All Professional disputed but that Carol Wright might
24  know about the specific charges All Professional contested.
    (Rudin Decl. in Supp. of Century 21's Reply Ex. C ("Steve Wright
25  Dep. IV") at 38:1-39:12 (Docket No. 112-1).)  Although it is true
    that a party may not create an issue of fact by submitting an
26  affidavit contradicting prior deposition testimony, see Kennedy
    v. Allied Mut. Ins. Co., 952 F.2d 262, 266-67 (9th Cir. 1991),
27  that does not appear to be the case here.  It is a perfectly
    reasonable inference to draw that after his deposition, Steve
28  Wright talked to Carol Wright and learned of the specific
    additional accounting disputes.

Professional argues that it was overcharged by $1,359 in advertising fees that were first charged in January 2007 and previously waived by Century 21 as an erroneous charge. (Id.) The only evidence that All Professional presents in support of this disputed charge is Steve Wright's conclusory deposition statement that the charge had been waived. (Id.) Century 21's alleged waiver of the charge appears to be connected to its 2008 proposal to waive All Professional's 2007 DAN and NAF fees in exchange for All Professional signing a one-year extension on its franchise fees. (Rubin Decl. Ex. B ("Carol Wright Dep. II") at 159:16-161:8.) Because All Professional did not agree to the proposal, Century 21's offer to waive the NAF fees is not binding. Steve Wright's conclusory statement arguing otherwise is not sufficient.[25] All Professional has thus failed to present evidence establishing a materially disputed fact regarding this charge.

Fourth, All Professional disputes a $1,500 charge for a lead router charged to the River Park franchise's account. (Steve Wright Decl. II ¶ 4.) According to Steve Wright, All Professional never agreed to pay for the router. (Id.) During oral arguments, Century 21 was unable to point to any evidence

---

[25] In All Professional's response to Century 21's statement of undisputed facts, it also states that in a June 16, 2010, phone conversation the parties reached an agreement to waive $304.50 in advertising fees. (Defs.' Resp. to Statement of Undisputed Facts ¶ 63 (Docket No. 95).) That agreement, however, was part of the parties' negotiations that were never finalized. Moreover, the evidence submitted by All Professional to support this claim does not discuss the advertising fees at all. All Professional does not rely on this evidence to support its dispute on the $1,359 charge and given the deficiencies in the evidence the court will not do so either.

disputing this claim.  Without knowing the circumstances under
which the lead router was provided to All Professional, the court
is unable to determine whether the charge is proper.  All
Professional has thus presented evidence sufficient to establish
a materially disputed fact regarding this charge.

Fifth, All Professional disputes the minimum royalty
fees and advertising fees assessed after August 31, 2009, when it
closed its Folsom office.  (Id.)  All Professional cites to no
provision of the franchise agreement that permits a franchise to
unilaterally close its franchise office and not pay the minimum
royalty fees, while still technically retaining its status as a
Century 21 franchise.  Under the contract, therefore, All
Professional was required to pay the minimum royalty fees until
the franchise agreement was terminated.  The court also notes
that All Professional's argument discussed above that Century 21
was not entitled to terminate the Folsom franchise because All
Professional still intended to reopen the office directly
contradicts its claim that it should not be responsible for any
fees during that period.  All Professional thus fails to provide
a materially disputed fact suggesting that it was not responsible
for the minimum royalty fees assessed on the Folsom franchise
after August 31, 2009.

Finally, All Professional objects to Century 21's
accounting for the Florin Road and Hawaii franchises on the
grounds that it "disputes the accuracy of the fees claimed by
Century 21."  (Id. ¶¶ 6, 7.)  This conclusory statement is
insufficient to create a genuine issue of material fact as to the
amounts owed under either franchise agreement.  See Anheuser-

52

1  Busch, Inc. v. Natural Beverage Distribs., 69 F.3d 337, 345 (9th

2  Cir. 1995) (noting that "conclusory or speculative testimony is

3  insufficient to raise a genuine issue of fact to defeat summary

4  judgment").

5         Accordingly, with respect to the damages that All

6  Professional owes Century 21 for breach of the franchise

7  agreements, the court finds that there is no genuine dispute as

8  to $195,454.90 of the $196,954.90 Century 21 claims.  There is,

9  however, a genuine dispute as to the remaining $1,500.00 claimed

10 by Century 21.

11              e.   Future Lost Profits

12        Section 16.7.2 of the franchise agreements provides

13 that in the event of early termination of the agreements, All

14 Professional shall immediately become obligated to pay Century 21

15 "lost future profits" that "shall be equal to the combined

16 monthly average of Royalty Fees, NAP contributions, and any other

17 fees under this Agreement . . . payable from the Effective Date

18 of this Agreement through the date of early termination,

19 multiplied by the number of months (or partial months) remaining

20 in the term of this Agreement" discounted to present value at a

21 rate of eight percent.  (Bertet Decl. Exs. A-D § 16.7.2.)  As a

22 result of the early termination of All Professional's franchises,

23 Century 21 claims that All Professional owes it lost future

24 profits in the amount of $250,029.34 on the River Park franchise,

25 $88,757.77 on the Folsom franchise, $155,671.48 on the Florin

26 Road franchise, and $80,541.98 on the Hawaii franchise.  (Id.

27 ¶¶ 42-45, Exs. R-U.)

28        "Generally, a liquidated damage clause is enforceable

53

1  in New Jersey where actual damages which would be sustained upon
2  a breach are difficult to project and are not readily susceptible
3  of proof under the rules of evidence.  The agreed upon sum must
4  not, however, be disproportionate to the presumable loss." <u>Cent.</u>
5  <u>Steel Drum Co. v. Gold Cooperage, Inc.</u>, 491 A.2d 49, 54 (N.J.
6  App. Div. 1985), <u>overruled on other grounds by</u> <u>Kutzin v. Pirnie</u>,
7  591 A.2d 932 (N.J. 1991).  The party challenging a liquidated
8  damages clause bears the burden of proving its unreasonableness.
9  <u>See</u> <u>id.</u>  "Thus, the party challenging a stipulated damages clause
10 'must establish that its application amounts to a penalty.'"
11 <u>Wasserman's Inc. v. Twp. of Middletown</u>, 137 N.J. 238, 253 (1994)
12 (quoting <u>Haromy v. Sawyer</u>, 98 Nev. 544, 654 (1982)).

13         The purpose of a stipulated damages clause is to
14 compensate the promisee for non-performance, and not to compel
15 the promisor to perform.  <u>Id.</u>  Accordingly, provisions for
16 liquidated damages are enforceable only if "the amount so fixed
17 is a reasonable forecast of just compensation for the harm that
18 is caused by the breach." <u>Westmount Country Club v. Kameny</u>, 82
19 N.J. Super. 200, 206 (App. Div. 1964).  A liquidated damages
20 clause is therefore unreasonable if "it does more than compensate
21 plaintiffs for their approximate actual damages caused by the
22 breach." <u>Wasserman's Inc.</u>, 137 N.J. at 254.  When considered at
23 the time of contracting, the liquidated damages calculation in
24 the franchise agreements, basing Century 21's expected lost
25 profits on an average of All Professional's monthly revenue
26 appears reasonable.

27         The New Jersey Supreme Court has suggested that
28 consideration of the reasonableness of a liquidated damages

clause at the time of breach, or actual damages, is also
appropriate in determining the reasonableness of the parties'
prediction of damages.[26]  Id. at 252.  "It is to be observed that
hindsight is frequently better than foresight, and that, in
passing judgment upon the honesty and genuineness of the
pre-estimate made by the parties, the court cannot help but be
influenced by its knowledge of subsequent events."  Id. (quoting
Corbin on Contracts § 1063 (1951)).  The court will therefore
consider the circumstances at the time of termination to
determine whether the liquidated damages clause is enforceable in
this case.

Here, All Professional presents evidence that it argues
suggests that at the time Century 21 terminated All
Professional's three franchises in Sacramento in Hawaii, it did
not expect that it would suffer any significant loss of profits.
In an email sent July 12, 2010, Bainbridge, a Century 21 business
consultant, told Popp, "I believe if we terminate we would get
most of the producing agents who are loyal to C21 . . . ."
(Compendium of Exhibits Ex. 34.)  After the terminations, in a
second email sent August 3, 2010, Bainbridge told Popp,
"Fortunately, we will more than replace [All Professional's]
production in this area with the Select ERA conversion this month

---

[26]   In this respect, consideration of liquidated damages
claims under New Jersey law differs from California law, which
requires the party seeking to invalidate a liquidated damages
clause to show that the provision is "unreasonable under the
circumstances existing at the time the contract was made."  Cal.
Civ. Code § 1671(b).

1   . . . ."[27]   (Id. Ex. 36.)   While these emails suggest that at

2   least Bainbridge did not believe that Century 21 would suffer

3   major losses after terminating All Professional, it falls far

4   short of establishing that the liquidated damages clause would be

5   disproportionate with Century 21's actual losses.   All

6   Professional continues to operate offices at all three locations

7   which would otherwise have resulted in franchise and advertising

8   fees for Century 21.   All Professional presents no evidence

9   concerning it or Century 21's past or current revenues in these

10  locations.   As the party with the burden of proof on this issue,

11  the two emails presented by All Professional is insufficient to

12  establish that Century 21 suffered no actual damages or that the

13  liquidated damages clause would be disproportionate with Century

14  21's losses.

15      The court is more sympathetic to All Professional's

16  arguments concerning the unfairness of applying the liquidated

17  damages clause to the Folsom franchise because All Professional

18  no longer operates an office at that location.   The court

19  nevertheless may not substitute its own intuition for the lack of

20  evidence presented by All Professional in this case, but must

21  instead look to the evidence presented by the parties.   As All

22  Professional pointed out in oral arguments, the emails from

23  Bainbridge were sent after the Folsom franchise was terminated

24  and therefore were not in reference to Century 21's profits in

25

26          [27]   Read in context, this second email only suggests that a
27  new franchise was moving into the area and that because of this
    Century 21's net commissions would remain the same, not that
28  Century 21 suffered no lost profits as a result of All
    Professional's termination.

1   Folsom.  All Professional presents no evidence regarding Century

2   21's losses in connection with the Folsom location.

3           Citing California law, All Professional further argues

4   that application of the liquidated damages clause would be

5   inappropriate in this case because Century 21 was the party that

6   chose to terminate the franchise agreement.  (Opp'n to Mot. for

7   Summ. Adjudication at 42:7-10 (citing Postal Instant Press, Inc.

8   v. Sealy, 43 Cal. App. 4th 1704, 1711 (2d Dist. 1996).)  The

9   California appellate court in Sealy found that where termination

10  of the franchise agreement was for failure to pay franchise fees,

11  the breach did not proximately cause the lost future profits and

12  therefore the liquidated damages provision was unenforceable.[28]

13  Sealy, 43 Cal. App. 4th at 1713.  Sealy's proximate cause

14  analysis has since been persuasively challenged in Radisson

15  Hotels Int'l, Inc. v. Majestic Towers, Inc., 488 F. Supp. 2d 953,

16  963 n.10 (C.D. Cal. 2007).  Absent compelling New Jersey

17  authority on the matter, the court will apply New Jersey's

18  presumption in favor of liquidated damages clauses.  See Cent.

19  Steel Drum, 491 A.2d at 54.[29]

20          Because there is not sufficient evidence showing that

21

22      [28]   Sealy is not applicable to the liquidated damages
23  clause for the Folsom franchise because that franchise agreement
    was terminated based on abandonment, not merely for failure to
24  pay franchise fees.

25      [29]   Even if the Sealy holding were applicable under New
    Jersey law, Sealy is distinguishable from the facts of the
26  current case because the franchise agreement in Sealy only
    vaguely stated that the franchisor would be entitled to the
27  "benefit of the bargain."  In this case, the franchise agreements
    expressly make All Professional liable for lost future profits
28  when early termination is "for cause," which includes failure to
    pay franchise fees.  See Radisson, 488 F. Supp. 2d at 962.

the liquidated damages provision will compensate Century 21 far in excess of its actual damages, the court finds that the provision is enforceable.  Accordingly, the court will grant Century 21's motion for summary damages as it relates to its liquidated damages request in the amount of $575,001.57.

2.   Breach of Guaranty

"The liability of a guarantor is measured by that of the principal, unless the agreement explicitly provides otherwise."  Nat'l Westminster Bank N.J. v. Lomker, 277 N.J. Super. 491, 498 (App. Div. 1994).  The Wrights signed guarantees on all four franchise agreements that cover all of All Professional and All Professional Hawaii's obligations under the franchise agreements.  (See Bertet Decl. Exs. A-D at 43-44.) Because the court found that All Professional breached the franchise agreements and because no payments have been made by the Wrights, it follows that the Wrights are also in breach of the guarantees.  Accordingly, the court will grant Century 21's motion for summary adjudication with respect to its breach of guaranty claim.

3.   Trademark Infringement and Unfair Competition

A federal claim for trademark infringement pursuant to section 32 of the Lanham Act requires (1) ownership of a registered trademark; (2) use of that mark beginning before the alleged infringer's use; (3) the alleged infringer's use without the alleged owner's consent; and (4) that the alleged infringer's use is likely to cause confusion, or to cause mistake, or to deceive.  See 15 U.S.C. § 1114(a); Century 21 Real Estate v. Sandlin, 846 F.2d 1175, 1178 (9th Cir. 1998); Intel Corp. v.

58

1  Americas News Intel Pub., LLC, No. C 09-05085, 2010 WL 2740063,

2  at *2 (N.D. Cal. July 12, 2010).  The elements of a federal

3  unfair competition claim for false designation of origin of

4  services under section 43(a) of the Lanham Act is identical to

5  the federal trademark infringement claim, with the exception that

6  the trademark need not be registered.  See 15 U.S.C. § 1125(a);

7  Intel Corp., 2010 WL 2740063, at *2.  The only elements the

8  parties dispute are whether the agreements were properly

9  terminated and whether Century 21 has met its burden to show

10  likelihood of confusion.

11         The merits of Century 21's claims depend in part on

12  whether Century 21 properly terminated the franchise

13  agreements.[30]  See McDonald's Corp. v. Robertson, 147 F.3d 1301,

14  1308 (11th Cir. 1998) ("[W]e find that the Lanham Act's

15  requirement that a franchisor demonstrate that unauthorized

16  trademark use occurred to prevail on the merits of a trademark

17  infringement claim against a franchisee necessitates some type of

18  showing that the franchisor properly terminated the contract

19  purporting to authorize the trademarks' use, thus resulting in

20  the unauthorized use of trademarks by the former franchisee."); S

21  & R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 375 (3d Cir.

22  1992) ("Once a franchise is terminated, the franchisor has the

23  right to enjoin unauthorized use of its trademark under the

24  Lanham Act.  Thus, Jiffy Lube will merit preliminary injunctive

25

26         [30]   Because All Professional was no longer operating the

27  Folsom office, and therefore did not continue to use Century 21's
    trademarks at that office, the court does not consider whether

28  Century 21 properly terminated All Professional's Folsom
    franchise under this claim.

relief if it can adduce sufficient facts indicating that its termination of Durst's franchises was proper."); see also Re/Max N. Cent., Inc. v. Cook, 272 F.3d 424, 430 (7th Cir. 2001). Termination of a franchise agreement may be improper under either the terms of the agreement or state franchise laws.  See Re/Max N. Cent., 272 F.3d at 430.

### a.   Use of Trademark Without Consent

As the court previously found, the evidence establishes that Century 21 properly terminated All Professional's franchises under the terms of the franchise agreements.  Century 21 notified All Professional of its intent to terminate the franchise agreements and the opportunity to cure in April 5, 2010, letters, following prior informal notices of failure to pay amounts due that All Professional had ignored.  Having not received payment of even the undisputed fees, Century 21 terminated the Sacramento office agreements effective July 9, 2010.  Century 21 thus properly waited more than 30 days after the notices of default were sent as required under section 16.2.4 before it terminated the agreements for All Professional's failure to cure.

### b.   Likelihood of Confusion

The court previously found that All Professional's continued use of the Century 21 marks was sufficient to establish a likelihood of confusion.  (See Jan. 24, 2011, Order at 22:21-24:27 (Docket No. 28).)  All Professional now argues that Century 21 has failed to show "actual confusion" by an appreciable number of people and that its holdover infringement was not "willful" because it desired to remain a Century 21 franchise and subsequently de-marked after the court's preliminary injunction

1    order.

2         Evidence of actual confusion is not required to prevail

3    on a motion for summary judgment of a trademark infringement

4    claim.  See J.L. Williams Co. v. Le Conte Cosmetics, 523 F.2d

5    187, 191 n.5-6 (9th Cir. 1975) ("Although the trial court found

6    no evidence of actual confusion, this fact does not preclude this

7    Court from concluding that there is a 'likelihood of confusion',

8    as actual confusion is merely one factor to be considered by the

9    Court when it makes its determination."). All Professional's

10   reliance on the decisions in Entrepreneur Media Inc. v. Smith,

11   279 F.3d 1135 (9th Cir. 2002), and KP Permanent Make-Up, Inc. v.

12   Lasting Impression I, Inc., 543 U.S. 111 (2004), to establish

13   that Century 21 has the burden to present proof of actual

14   confusion is misplaced.  These decisions only establish that

15   Century 21 bears the burden of proving likelihood of confusion

16   for an appreciable number of people, not actual confusion.  See

17   KP Permanent Make-Up, 543 U.S. at 121-22; Entrepreneur Media, 279

18   F.3d at 1151.  As the court described in detail in its

19   preliminary injunction order, Century 21 has met this burden.

20   (Jan. 24, 2011, Order at 22:21-24:27.)  All Professional has

21   presented no new facts suggesting that the court's prior order

22   was mistaken.

23        All Professional's underlying intent when it used the

24   Century 21 marks without authorization is irrelevant to the

25   question of willfulness.  It is undisputed that All Professional

26   was informed upon termination that it needed to de-identify.  The

27   fact that "All Professional desired to avoid disrupting their

28   relationships with their clients and their agents while this

dispute was litigated," (Opp'n to Mot. for Summ. Adjudication at 45:2-3), does not excuse its violation of Century 21's trademark. There is no recognized exception to the Lanham Act that allows infringers to continue using a mark during a legal dispute. All Professional has thus failed to provide material facts suggesting that its infringement was not willful. All Professional's remedy if it believed that its franchises were wrongfully terminated was to sue for damages and seek a preliminary injunction, not to continue to use Century 21's marks without paying franchise fees.

All Professional's infringement of Century 21's marks began in July 2010, when it failed to de-identify after its franchises were terminated. All Professional's argument that it is not liable for trademark infringement because it de-marked after the court issued its preliminary injunction order in January 2011, lacks legal support. All Professional was no longer authorized to use Century 21's trademarks after its franchises were terminated, and the fact that the court did not issue a preliminary injunction for several months after the termination did not give All Professional the right to use Century 21's marks without Century 21's authorization. All Professional has thus failed to present material facts suggesting that it did not violate Century 21's trademark.

In conjunction with its trademark claims, Century 21 also requests injunctive relief. The Lanham Act gives courts the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation" of a registrant's rights. 15 U.S.C. § 1116(a). Injunctions are especially appropriate where the

62

1  infringing use is for a similar service.  See Century 21 Real
2  Estate Corp. v. Sandlin, 846 F.2d 1175, 1181 (9th Cir. 1988).
3  The standard for a permanent injunction is essentially the same
4  as for a preliminary injunction, with the exception that the
5  plaintiff must show actual success, rather than a likelihood of
6  success.  See Amoco Prod. Co. v. Village of Gambell, 480 U.S.
7  531, 546 n.12 (1987).  Since Century 21 has succeeded on its
8  trademark infringement claim, it is entitled to a permanent
9  injunction.  Accordingly the court will grant Century 21's motion
10  for summary adjudication of its trademark infringement and unfair
11  competition claims and will permanently enjoin All Professional
12  from further use of Century 21's marks.

13              c.   Damages

14       Having found that All Professional infringed upon
15  Century 21's trademarks, the court next determines the
16  appropriate damages.  The damages provision of the Lanham Act
17  states:

18           When a violation of any right of the
             registrant of a mark . . . shall have been
19           established in any civil action arising under
             this chapter, the plaintiff shall be entitled
20           . . . to recover (1) defendant's profits, (2)
             any damages sustained by the plaintiff, and
21           (3) the costs of the action.

22  15 U.S.C. § 1117(a).  Century 21 requests treble damages of
23  $86,022.00.

24       Century 21 claims that it was damaged in an amount
25  equal to the minimum franchise fees that All Professional would
26  have been required to pay to continue using Century 21's marks
27  for its three operational offices under the franchise agreements.
28  The minimum franchise fees total $3,186.00 per month for the

1  three franchises.  This estimation of damages is reasonable
2  because it represents the minimum amount that Century 21 would
3  have received if All Professional had been authorized to use
4  Century 21's marks, and, if anything, Century 21's actual damages
5  could have been higher than this figure.  Because All
6  Professional continued to take advantage of the franchise
7  agreements' benefits, enforcement of All Professional's
8  obligations under the agreements is appropriate.

9        As the court discussed above, All Professional's use of
10 Century 21's mark was willful.  When the infringer's use of a
11 counterfeit mark is willful, section 1117(b) requires the court
12 to award treble damages unless the court finds extenuating
13 circumstances.  15 U.S.C. § 1117(b).  There are no such
14 extenuating circumstances in this case.  All Professional's
15 infringement was willful and it refused to de-mark until the
16 court issued an order enjoining its use of the marks.

17       All Professional argues that treble damages may only be
18 applied to provide compensation and not punishment, however the
19 cases that it relies upon discuss the award of treble damages
20 under § 1117(a) and not § 1117(b).  Under § 1117(a), a court may
21 enhance actual damages to a level, not to exceed three times
22 actual damages, when the award of actual damages would not be
23 sufficient to adequately compensate the trademark holder.  Id.
24 § 1117(a).  Under § 1117(b), the court shall award treble damages
25 unless there are extenuating circumstances, suggesting that the
26 purpose of § 1117(b) is punishment and not compensation.  The
27 court is therefore not prohibited from awarding treble damages
28 under § 1117(b) that may serve primarily to punish All

1  Professional.

2       All Professional continued to use Century 21's marks
3  for more than nine months after it was informed of the
4  termination of its franchises and instructed to discontinue use
5  of the marks.  All Professional has presented no material facts
6  suggesting that an award of actual damages equal to its minimum
7  franchise fees is not proper.  It is additionally beyond dispute
8  that All Professional's use of Century 21's marks was willful
9  during this period.  Accordingly, the court will grant Century
10 21's motion for summary adjudication of damages on its trademark
11 infringement and unfair competition claims in the amount of
12 $86,022.00.

13       B.   All Professional's Claims

14            1.   Breach of Contract

15       All Professional relies on the same arguments to
16 support its breach of contract claim as it did in defense of
17 Century 21's breach of contract claim.  As the court discussed
18 above, All Professional fails to raise a genuine issue of
19 material fact suggesting that Century 21 breached the franchise
20 agreements or the DAN.  Accordingly, the court will grant
21 Century 21's motion for summary adjudication as to All
22 Professional's claims for breach of contract.

23            2.   Unfair Competition

24       All Professional and the Wrights assert a claim for
25 violation of California's Unfair Competition Law ("UCL").  See
26 Cal. Bus. & Prof. Code § 17200, et seq.  The court has found,
27 however, that New Jersey law is applicable in this action and
28 the parties have not suggested that New Jersey has an analogous

65

1  UCL claim.  See Medimatch, Inc. v. Lucent Techs., Inc., 120 F.

2  Supp. 2d 842, 861-62 (N.D. Cal. 2000) (dismissing California UCL

3  claim on basis that claim fell within scope of New Jersey

4  choice-of-law provision).  Accordingly, the court will grant

5  Century 21's motion for summary adjudication with respect to All

6  Professional's UCL claim.

7              3.   Implied Covenant of Good Faith and Fair Dealing

8              Under New Jersey law, there is an implied covenant of

9  good faith and fair dealing in every contract.  Onderdonk v.

10 Presbyterian Homes, 85 N.J. 171, 182 (1981).  The implied

11 covenant prohibits a party to the contract from doing anything

12 that "will destroy or injure the right of the other party to

13 receive the fruits of the contract."  Feldman v. U.S. Sprint

14 Commc'ns Co., 714 F. Supp. 727, 731 (D.N.J. 1989).  However, the

15 "function of the court is to enforce the [agreement] as written,

16 not to write for the parties a different or a better contract."

17 Liqui-Box Corp. v. Estate of Elkman, 238 N.J. Super. 588,

18 599-600 (App. Div. 1990).  "Although the implied covenant of

19 good faith and fair dealing cannot override an express term in a

20 contract, a party's performance under a contract may breach that

21 implied covenant even though that performance does not violate a

22 pertinent express term."  Wilson v. Amerada Hess Corp., 168 N.J.

23 236, 244 (2001) (citing Sons of Thunder, Inc. v. Borden, 148

24 N.J. 396, 419 (1997)).  The New Jersey Supreme Court has

25 cautioned, however, that "an allegation of bad faith or unfair

26 dealing should not be permitted to be advanced in the abstract

27 and absent an improper motive."  Id. at 251.

28              All Professional argues in conclusory fashion that

66

1  Century 21 breached the implied covenant of good faith and fair

2  dealing for the same reasons that it alleges Century 21 breached

3  the franchise agreements.  As the court discussed above,

4  adopting All Professional's interpretation of the franchise

5  agreements would be either inconsistent with or contrary to the

6  express provisions of the agreements.  All Professional provides

7  no justification for why any of these alleged breaches should be

8  considered differently under the implied covenant than under All

9  Professional's breach of contract claim.[31]

10        In addition to the alleged contract breaches that All

11  Professional presented, All Professional argues two additional

12  ways in which Century 21 breached the implied covenant.  The

13  first claim is that Century 21 engineered the termination of All

14  Professional's franchises because of pressure from competing

15  Century 21 brokers.  All Professional fails, though, to provide

16  any explanation of how Century 21 was able to engineer the

17  terminations.  Indeed, given that it was All Professional's

18  decision to close its Folsom franchise, stop paying its

19  franchise fees, and not cure its defaults during the cure period

20  it would seem unlikely that Century 21 would have been able to

21  do so.  All Professional similarly fails to provide any

22  authority in support of its claim.

23        Second, All Professional argues that Century 21

24

25        [31]   All Professional additionally argues that under
   California law, Century 21 was obligated to exercise its
26  discretion in good faith.  (See Opp'n to Mot. for Summ.
   Adjudication at 32:19-26.)  It is unclear to the court what
27  discretionary decision All Professional refers to.  As the court
   has found throughout its order, there is no evidence that Century
28  21 acted outside the authority granted to it under the franchise
   agreements or that its actions were taken in bad faith.

1   breached the implied covenant of good faith and fair dealing
2   when it disregarded its own policy by terminating All
3   Professional's franchises despite its "good faith attempts to
4   pay the service fees and restructure the DAN note." (Opp'n to
5   Mot. for Summ. Adjudication at 33:13-14.)  Century 21 though was
6   not obligated to provide All Professional a payment plan, nor
7   was it obligated to continue negotiations with All Professional
8   on reaching a payment agreement when the cure date had passed
9   over two months before.  All Professional has not produced any
10  evidence other than the franchise agreements that would suggest
11  that All Professional had a legitimate reason to expect that its
12  good faith efforts should have forestalled termination.  Nor has
13  All Professional presented any authority suggesting that
14  franchisors may not terminate franchises for failure to meet
15  financial obligations when franchisees act in good faith under
16  the implied covenant of good faith and fair dealing.

17       All Professional's laundry list of Century 21's
18  alleged violations of the implied covenant of good faith and
19  fair dealing fails to establish any material facts suggesting
20  that Century 21 acted in a manner that injured All
21  Professional's right to receive the benefits of the franchise
22  agreements.  Accordingly, the court will grant Century 21's
23  motion for summary adjudication on All Professional's claim for
24  breach of the implied covenant of good faith and fair dealing.

25       4.  Fraud

26       Under New Jersey law, the essential elements of fraud
27  are (1) a material representation pertaining to a presently
28  existing or past fact; (2) made with knowledge of the falsity of

68

1  the representation and with an intention that the other party

2  rely on the representation; and, (3) justifiable reliance on the

3  representation which results in actual damage.  Gennari v.

4  Weichert Co. Realtors, 148 N.J. 582, 610 (1997) (citing Jewish

5  Ctr. of Sussex Cnty. v. Whale, 86 N.J. 619 (1981)).  All

6  Professional identifies two alleged misrepresentations that it

7  argues are actionable under its fraud claim: (1) Omer's comment

8  that Century 21 would provide "tools and systems" to increase

9  All Professional's productivity; and (2) Popp's representation

10  that he would "take care of the issues" with Corporate after All

11  Professional defaulted under its franchise agreements.[32]

12      Under New Jersey law, "[t]he fraud must be in the

13  original contract or transaction and not in the nonfulfillment

14  of the contract."  Anderson v. Modica, 4 N.J. 383, 392 (1950)

15  (citing Ebert v. Givas, 158 A. 412, 413-14 (N.J. Err. & App.

16  1931)).  "It is the general rule that fraud cannot be predicated

17  upon statements which are promissory in their nature at the time

18  they are made and which relate to future actions or conduct.

19  Thus fraud cannot be predicated upon the mere non-performance of

20  a promise."  Barry by Ross v. N.J. State Highway Auth., 245 N.J.

21  Super. 302, 310 (1990).  A failure to fulfill a promise may

22  constitute a breach of contract, but it is not fraud and the

23  non-performance of that promise does not make it so.  Anderson,

24

25      [32]   In its interrogatory response regarding this claim, All
   Professional actually identified eleven separate representations
26  that it would rely upon for its fraud claim.  In its motion for
   summary adjudication Century 21 addressed all eleven claims.  All
27  Professional only mentioned one of these alleged
   misrepresentations in its opposition papers and acknowledged
28  during oral arguments that it was not pursuing claims under the
   representations that it did not address.

4 N.J. at 392.  "Such conduct is a misrepresentation only if the promisor knew when he made it that the promise could not or would not be fulfilled."  Barry by Ross, 245 N.J. at 310 (citing Ocean Cape Hotel Corp. v. Masefield Corp., 63 N.J. Super. 369, 380-81 (App. Div. 1960).

First, All Professional argues that in 2005, at the time it was signing franchise renewals and the DAN, Omer falsely represented that Century 21 was going to develop tools and systems that would keep All Professional productive so that they would not have to pay back the DAN.  This representation is not actionable under New Jersey law because it does not relate to a past or present fact, but is rather a prediction about what Century 21 would do in the future.  See Anderson, 4 N.J. at 391-92.  All Professional does not present any evidence suggesting that when Omer made these representations he knew that Century 21 would not be developing such tools and systems.

All Professional additionally fails to demonstrate that it reasonably relied on Omer's statements and would have acted differently had the alleged misrepresentations not been made.  "Reliance is not reasonable where the substance of the alleged misstatement is contradictory of any of the undertakings expressly dealt with by the written contract."  Luso Fuel, Inc. v. BP Prods. N. Am., Inc., No. 08-CV-3947, 2009 WL 1873583, at *5 (D.N.J. June 29, 2009) (citing Winonka Village, Inc. v. Tate, 16 N.J. Super. 330, 334 (App. Div. 1952)).  Here, the alleged representation that repayment would not be required contradicts the repayment provision in the DAN, the Security Agreement setting forth collateral to secure the DAN, and the addendum to

the River Park franchise agreement.  Given the terms of these contracts, any reliance on Omer's statements was unreasonable. All Professional thus fails to establish material facts suggesting that Omer's statement was a fraudulent misrepresentation.

Second, All Professional argues that while it was negotiating an alternate payment plan for its default, Popp affirmatively represented that he would "take care of the issues" with Century 21's corporate team.[33]  As an initial matter, the only evidence that All Professional relies upon to suggest that this representation was actually made is Steve Wright's declaration that was attached to All Professional's opposition papers.  (See Steve Wright Decl. II, ¶ 13 ("From June 18, 2010 until July 9, 2010, I spoke with Mr. Popp several times where he repeatedly assured me that he was working out the payment terms with 'New Jersey' (Century 21's executive team).").)[34]  The fact that Popp was "working out the payment

---

[33]   Century 21 objects to All Professional's reliance on this representation because it was not listed in All Professional's interrogatory response as one of the misrepresentations that All Professional intended to rely upon. The court will nonetheless consider All Professional's argument on the matter.

[34]   During Steve Wright's deposition, he also talked about two phone calls that he had with Popp that Steve Wright described as "his assurances that this would all work out."  (Steve Wright Dep. I at 213:6-7.)  When asked to discuss these phone calls in greater detail, Steve Wright described the first call as Popp giving him a "one sentence spiel: I'll talk to Corporate, and we'll see if we can work it out.  Just give me a couple of days, click."  (Id. at 213:21-23.)  In the second phone call, Popp "said he was going to call Corporate, and he would call us back, and he never did."  (Id. at 214:4-5.)  Neither of these phone calls support All Professional's argument that Popp said that he would "take care of issues" with Corporate or provide an assurance that "this will all work out."

terms" is a far cry from All Professional's interpretation of this statement as being that Popp "would take care of issues."

Assuming that All Professional did have sufficient evidence to prove that this representation was made, All Professional's claim still fails as a matter of law.  It is not clear that the purported statement is a misrepresentation of fact, rather than an ambiguous statement regarding a future action that Popp would take.  See Anderson, 4 N.J. at 391-92 (stating that a misrepresentation must be about past or present fact).

All Professional additionally fails to present evidence that Popp knew that this representation was false at the time he spoke with the Wrights.  The only evidence All Professional presents actually establishes the opposite -- in an email sent by Popp to Bainbridge on July 12, 2010, he states that he "thought we were getting close on a deal." (Compendium of Exhibits Ex. 34.)  This statement, made at least three days after All Professional argues the alleged misrepresentation was made, strongly suggests the Popp did not know that All Professional's attempt to negotiate an alternative payment plan would be unsuccessful.

Finally, All Professional's fraud claim fails because it is unable to show reliance on Popp's statement to its detriment.  Any alleged statement by Popp was made after All Professional's missed cure date of May 10, 2010, so reliance on a statement made in either June or July fails to explain why All Professional did not cure its default.

There are no material facts supporting All

72

1  Professional's claim for fraud against Century 21.  Accordingly,

2  the court will grant Century 21's motion for summary

3  adjudication as to All Professional's fraud claim.

4       5.  Interference with Business Advantage/Contract

5      All Professional brings three causes of action related

6  to Century 21's alleged interference with its business: (a)

7  Intentional Interference with Business Advantage; (b) Negligent

8  Interference with Business Advantage; and (c) Interference with

9  Contract.  All of these claims are based on All Professional's

10 allegations that Century 21 deliberately disrupted All

11 Professional's relationships with its own agents, customers, and

12 potential customers in retaliation for Steve Wright's complaints

13 about Century 21's favorable treatment of Century 21 Select.

14     a.   Intentional Interference

15     Although torts for interference with contract are

16 separate from interference with business advantage, see Printing

17 Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 750 (1989)

18 (stating "[t]he separate cause of action for the intentional

19 interference with a prospective contractual or economic

20 relationship has long been recognized as distinct from the tort

21 of interference with the performance of a contract"), the

22 elements of each claim are the same.  See Jenkins v. Region Nine

23 Hous. Corp., 306 N.J. Super. 258, 265 (App. Div. 1997) ("Whether

24 the tort is denominated as an intentional interference with

25 contractual advantage, or future economic advantage, the import

26 is the same.").  To recover under a claim for tortious

27 interference, a plaintiff must prove: "(1) a protected interest,

28 not necessarily amounting to an enforceable contract; (2)

73

defendant[s'] intentional interference without justification;
(3) a reasonable likelihood that the benefit plaintiff
anticipated from the protected interest would have continued but
for the interference; and (4) resulting damage." Id.

To succeed on its claims for intentional tortious
interference, All Professional must show that Century 21's
alleged conduct constituting interference was intentional and
with "malice." See Printing Mart, 116 N.J. at 751 (stating a
complaint of tortious interference "must allege facts claiming
that the interference was done intentionally and with
'malice'"). Malice is defined as intentionally inflicted harm
without justification or excuse. Id. A determination of malice
must focus on a defendant's action as presented by the unique
facts of each individual case. Id. at 756-57. "Not only must
[a] defendant[']s[ ] motive and purpose be proper but so also
must be the means." Id. at 757 (alterations in original)
(internal quotation marks and citation omitted). However,
"[c]onduct admittedly spurred by spite and ill-will is not
necessarily sufficient to sustain an action for tortious
interference with an economic advantage." Lamorte Burns & Co.
v. Walters, 167 N.J. 285, 307 (2001). "The line clearly is
drawn at conduct that is fraudulent, dishonest, or illegal and
thereby interferes with a competitor's economic advantage."
Id.; see also Shebar v. Sanyo Bus. Sys. Corp., 218 N.J. Super.
111, 118 (App. Div. 1987) (finding an employee who was fired
after his employer used deceit to induce him to revoke
acceptance of an outside employment offer until a replacement
was found satisfied the malicious interference requirement).

1    All Professional fails to specifically address the

2 malice requirement.  Instead, it suggests that Century 21's

3 wrongful conduct, engineering the terminations of All

4 Professional's franchises, was motivated largely because of

5 Steve Wright's continuous, unresolved complaints about Select

6 and Century 21's preference toward Select.  All Professional

7 then proceeds to repeat the same laundry list of complaints that

8 this court has repeatedly addressed and found not to be breaches

9 of contract or fraudulent.[35]  Although Steve Wright's contentious

10 behavior may have contributed to feelings of ill will between

11 the parties, in order to show that Century 21's actions rise to

12 the level of malice, All Professional must show that the actions

13 lacked justification or excuse.  See Printing Mart, 116 N.J. at

14 751.

15    "A party's actions in its own interest and for its own

16 financial benefit will not rise to the level of malice."

17 Cargill Global Trading v. Applied Develop. Co., 706 F. Supp. 2d

18 563, 575 (D.N.J. 2010).  Instead, a business-related explanation

19 can justify a party's actions, so long as the business-related

20 explanation justifies not only the defendant's motive and

21 purpose, but also the means that it employed.  See Lamorte Burns

22 & Co., 167 N.J. at 307.  In Ideal Dairy Farms, Inc. v. Farmland

23

24    [35]   All Professional also argues that "Century 21's sharing
     of All Professional's business methods to Select was a violation
25   of California Trade Secrets Act."  (Opp'n to Mot. for Summ.
     Adjudication at 38:11-13 (citing Cal. Civ. Code § 3426.1).)
26   Other than alleging that Century 21 shared information regarding
     All Professional's financial difficulties, there is no evidence
27   that Century 21 shared information regarding All Professional's
     "business methods."  All Professional does not explain how these
28   undefined methods might qualify as trade secrets or violate the
     Trade Secrets Act.

75

1  <u>Dairy Farms, Inc.</u>, 282 N.J. Super. 140, 205 (App. Div. 1995),

2  the New Jersey Appellate Division reversed a trial court's

3  finding of tortious interference, noting that even if the

4  defendant's behavior had been motivated by spite and was

5  directly aimed at hurting the plaintiff's business, this did not

6  rise to the level of tortious interference because defendant had

7  a "legitimate business reason to 'target' [the plaintiff] . . .

8  regardless of any other motivation." <u>Id.</u> at 201; <u>see also</u> <u>Cedar</u>

9  <u>Ridge Trailer Sales, Inc. v. Nat'l Cmty. Bank of N.J.</u>, 312 N.J.

10 Super. 51, 67 (App. Div. 1998) ("At worst, the Bank was

11 advancing its 'own interest and financial position,' which is

12 not enough to establish tortious interference.").

13          The court finds that the undisputed evidence shows

14 that Century 21's actions were motivated by a genuine business

15 concern and therefore did not rise to the level of malice

16 required to bring a claim for intentional tortious interference.

17 Accordingly, the court will grant Century 21's motion for

18 summary adjudication of All Professional's claims for

19 intentional interference with business advantage and

20 interference with contract.

21                    b.    <u>Negligent Interference with Business</u>

22                          <u>Advantage</u>

23          All Professional additionally brings a claim for

24 negligent interference with business advantage, although it

25 fails to address the application of New Jersey law to this

26

27

28

claim.[36]  Although there is very little New Jersey caselaw addressing negligent interference claims, the court has located two cases that rely on People Express Airlines to suggest that negligent interference with prospective advantage claims may be brought under New Jersey law.  See Eaton v. Tosti, Civ. No. 09-5248, 2010 WL 2483318, at *9 (D.N.J. June 4, 2010) (citing People Express Airlines Inc. v. Consol. Rail Corp., 100 N.J. 246, 263 (1985)); Reed Elsevier, Inc. v. Inherent.com, Inc., Civ. No. 05-4048, 2006 WL 3827414, at *7 (D.N.J. Dec. 27, 2006) (citing People Express Airlines, 100 N.J. at 263).  The People Express Airlines court, however, only held that purely economic loss caused by negligence is compensable in tort, not that there is a cause of action for negligent interference.  See People Express Airlines, 100 N.J. at 263.

        The vast majority of New Jersey precedent instead discusses claims for tortious interference, as opposed to intentional or negligent interference.  See, e.g., Printing Mart, 116 N.J. at 751; Cargill, 706 F. Supp. 2d at 575; Jenkins, 306 N.J. Super. at 265.  These decisions suggest that in order to state a claim for tortious interference, the plaintiff must demonstrate that the defendant acted with malice.  See Cargill, 706 F. Supp. 2d at 575.  Malice is traditionally not a required element of a negligent interference claim, thus, these cases suggest that plaintiffs may not bring a claim for negligent

---

[36]   It is interesting to note that when All Professional answered the complaint that Century 21 filed in New Jersey state court, All Professional's counterclaim alleged a cause of action for tortious interference and not intentional or negligent interference.

interference under New Jersey law.  Given that the overwhelming majority of New Jersey cases only discuss claims for tortious interference, this court finds that there is no cause of action under New Jersey law for negligent interference with business advantage.

Even if the court were to find that All Professional could bring a claim for negligent interference under New Jersey law, neither of the New Jersey cases applying the claim suggest what the elements of negligent interference would be.  Instead, both cases quote language from People Express Airlines discussing the duty of care that a defendant owes to a plaintiff.  See Eaton, 2010 WL 2483318, at *9 (citing People Express Airlines, 100 N.J. at 263); Reed Elsevier, 2006 WL 3827414, at *7 (citing People Express Airlines, 100 N.J. at 263).  The court would therefore apply the four part test from New Jersey's intentional interference claim, with the exception that under the second element -- intentional interference without justification -- All Professional would need only show that Century 21's interference was negligent.  A showing of negligence further requires All Professional to demonstrate that Century 21 violated a duty of care that it owed to All Professional.  See People Express Airlines, 100 N.J. at 263.

In support of its claim, All Professional merely asserts the same laundry list of reasons why it believes that Century 21's conduct was wrongful.  All Professional does not discuss what duties Century 21 owed to it or how Century 21's actions or inactions constituted a breach of this duty (but not a breach of contract).  Century 21's termination of All Professional's franchises may have

interfered with its business interests, but the court has already held that the termination was proper and not wrongful.  All Professional's other claims largely stem from complaints regarding Century 21's inaction, however All Professional has not suggested that Century 21 had a duty to act.  All Professional fails to raise material facts establishing a claim for negligent interference.

Accordingly, the court will grant Century 21's motion for summary adjudication as to All Professional's claim for negligent interference with business advantage.

### 6.   Violation of Franchise Investment Laws

Finally, All Professional alleges that Century 21 violated California's Franchise Investment Law, Cal. Bus. & Prof. Code § 20000, et seq., and Hawaii's Franchise Investment Law, Haw. Rev. Stat. § 482(E), by terminating the franchise agreements without cause.  As an initial matter, application of either California's or Hawaii's statutory franchise provisions is inappropriate given the franchise agreements' valid New Jersey choice-of-law provision.  Even if consideration of All Professional's claim were proper, the court has rejected All Professional's allegation that Century 21 lacked good cause to terminate its franchises.  Accordingly, the court will grant Century 21's motion for summary adjudication as to All Professional's claim for violation of franchise investment laws.

IT IS THEREFORE ORDERED that:

(1) Century 21's motion for summary adjudication of its claim for breach of contract be, and the same hereby is, GRANTED IN PART with respect to Century 21's claim for breach of contract, actual damages totaling $195,454.90, and future lost profits totaling $575,001.57, and DENIED IN PART with respect to Century 21's request

79

1  for $1,500.00 in actual damages;

2          (2) Century 21's motion for summary adjudication of its

3  claim for breach of guaranty be, and the same hereby is, GRANTED;

4          (3) Century 21's motion for summary adjudication of its

5  claims for trademark infringement and unfair competition be, and the

6  same hereby is, GRANTED and Century 21 is awarded treble damages in

7  the amount of $86,022.00;

8          (4) Century 21's motion for summary adjudication of all of

9  All Professional and the Wrights' claims be, and the same hereby is,

10  GRANTED; and

11          (5) Steve Wright, Carol Wright, and All Professional are

12  HEREBY PERMANENTLY ENJOINED from further unauthorized use of Century

13  21's Marks, as defined in the franchise agreements.

14          This matter shall remain on calendar for a pretrial

15  conference on September 17, 2012, and bench trial on October 30, 2012,

16  on Century 21's remaining claims, including Century 21's $1,500.00

17  damages request for breach of contract.  If Century 21 files a written

18  statement within 15 days from the date of this Order, dismissing its

19  remaining claims and agreeing to accept judgment in accordance with

20  this Order, the court will vacate the pretrial conference and trial

21  dates enter final judgment in accordance with this Order.

22  DATED:  August 7, 2012

23

24  _____
    WILLIAM B. SHUBB
25  UNITED STATES DISTRICT JUDGE

26

27

28

                              80